# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-00341-DDD-KAS

JAMES KARAS, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

NEWMONT CORPORATION, THOMAS R. PALMER, NATASCHA VILJOEN, KARYN F. OVELMEN, and PETER TOTH,

Defendants.

---

## AMENDED COMPLAINT FOR VIOLAION OF THE FEDERAL SECURITIES LAWS

---

# TABLE OF CONTENTS

I.    NATURE OF THE CASE ................................................................................1

II.   JURISDICATION AND VENUE ....................................................................3

III.  PARTIES ........................................................................................................4

IV.   SUBSTANTIVE ALLEGATIONS .................................................................6

    A.    Newmont's Business ...........................................................................6

        1.    Production of Gold and Other Metals ....................................7

        2.    Costs associated with mining ................................................9

    B.    Newmont Focuses on Tier 1 Assets .................................................11

        1.    Tier 1 Assets ........................................................................11

        2.    The Newcrest acquisition .....................................................12

        3.    The Tier 1 Assets Newmont Acquired From Newcrest.........16

            a)    Lihir .........................................................................16

            b)    Brucejack...................................................................27

    C.    Defendants Focus on Increasing Production and Decreasing Costs ........................35

V.    FALSE AND MISLEADING STATEMENTS ...............................................43

VI.   THE TRUTH EMERGES ..............................................................................57

VII.  INSIDER TRADING ....................................................................................66

    A.    Defendants Palmer and Toth Institute Stock Trading Plans at Suspicious
          Times, Enabling Them to Sell Material Amounts of their Own Shares at
          Artificially Inflated Prices .............................................................66

        1.    Palmer's Stock Sales Before and After He Instituted His 10b5-1 Plan .........66

        2.    Toth's Stock Sales Before and After He Instituted His 10b5-1 Plan.............68

        3.    The Insider Sales by Palmer and Toth Demonstrate Scienter ........................69

VIII. LOSS CAUSATION AND ECONOMIC LOSS................................................70

IX.    NEITHER THE PSLRA SAFE HARBOR NOR THE BESPEAKS CASUTION
       DOCTRINE APPLIES ............................................................................................71

X.     THE FRAUD ON THE MARKET PRESUMPTION .........................................................72

XI.    CLASS ALLEGATIONS ......................................................................................73

XII.   COUNTS.........................................................................................................75

XIII.  PRAYER FOR RELIEF ..........................................................................................79

XIV.   JURY DEMAND...................................................................................................80

ii

1.     Lead Plaintiffs Shahid Latif Mian ("Mian") and Catherine Almrud Holdings, Inc. ("Almrud Holdings"), and named Plaintiff James Karas ("Karas" and together with Almrud Holdings and Mian "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Amended Complaint for violations of the federal securities laws ("Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, including, without limitation: (a) review and analysis of Newmont Corporation's ("Newmont" or "Company") filings with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of Newmont's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## I.     NATURE OF THE CASE

2.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Newmont common stock between July 24, 2024, and October 23, 2024, inclusive ("Class Period"), seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5, promulgated thereunder ("Class").

3.     Newmont is the world's largest gold mining company by market cap. In 2023, it acquired Newcrest Mining Limited ("Newcrest"), another large cap gold mining company. Newcrest owned a portfolio of mines, including, notably, Lihir, in Papua New Guinea, and Brucejack, in Northwest Canada. Defendants repeatedly boasted about the Newcrest acquisition, touting plans to increase production and reduce costs. In reality, Newmont management conducted woefully

insufficient due diligence to support these claims. In actuality, the Lihir mine was prone to significant shortfalls in reliability and safety, and the "nuggety" ore of the Brucejack deposit was of virtually unprecedented variability, making it extremely difficult to accurately predict the "head grade" (concentration of gold) of ore fed to the Brucejack mill in any particular quarter. Indeed, Brucejack's nuggety ore required significantly more stope development than had been accomplished by Newcrest, requiring time consuming and costly mine development operations.

4.      In February 2024, after three months operating the mines Newmont acquired from Newcrest, Defendants issued guidance for 2024 and beyond, forecasting increasing production year over year and decreasing all-in-sustaining costs ("AISC"). Whether Defendants issued their February 2024 guidance in good faith is not at issue. No later than late July 2024, however, with Newmont having owned and operated the Newcrest projects for over eight months, Defendants knew or recklessly disregarded that materially adverse operational, production, and cost issues at Lihir (such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow) and operational and grade issues at Brucejack (nuggety nature of deposits that required further, expensive development of the site) would adversely impact Newmont's production, margins, and financial results in 3Q2024 and beyond.

5.      On October 23, 2024, and October 24, 2024, Defendants shocked investors, disclosing that material, adverse production and cost issues had caused Newmont to report poor results from at least two gold mines it had acquired a year earlier. Analysts at J.P. Morgan summarized the bad news. Newmont's EBITDA was 15% below estimates and its most salient measure of costs, all in sustaining costs, were 22% higher than J.P. Morgan's forecast. In addition, gold production at important mines was flat, and Defendants disclosed for the first time that the increase in production and decrease in costs through 2028 which they had repeatedly forecast was now highly unlikely in the near and medium terms. In direct response to this news, Newmont's common stock price fell nearly 15% from

2

an October 23, 2024, closing price of $57.74 to an October 24, 2024, closing price of $49.25 on relatively high volume of over 37 million shares traded.

6.      In direct response to this news, Newmont's common stock price fell nearly 15% from an October 23, 2024 closing price of $57.74 per share to an October 24, 2024 closing price of $49.25 per share on relatively high volume of over 37 million shares traded, causing investor losses.

7.      Plaintiffs bring this action, on behalf of themselves and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

## II.      JURISDICTION AND VENUE

8.      Plaintiffs assert claims under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, promulgated thereunder. 17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Newmont is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

11.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

III.    **PARTIES**

12.    Plaintiff Mian's Certification (Dkt. No. 18-2) evidences his transactions in Newmont common during the Class Period. Mian purchased Newmont stock at artificially inflated prices and was damaged upon the revelation of the Defendants' fraud.

13.    Plaintiff Almrud Holdings's Certification (Dkt. No. 19-5) evidences its transactions in Newmont common during the Class Period. Almrud Holdings purchased Newmont stock at artificially inflated prices and was damaged upon the revelation of the Defendants' fraud.

14.    Plaintiff Karas's Certification (Dkt. No. 16-1) evidences his transactions in Newmont common during the Class Period. Plaintiff Karas purchased Newmont stock at artificially inflated prices and was damaged upon the revelation of the Defendants' fraud.

15.    Newmont Corporation is a Delaware corporation with its principal executive offices located at 6900 E Layton Avenue, Denver, Colorado 80237. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "NEM."

16.    Defendant Thomas R. Palmer ("Palmer") was, at all relevant times, the President and Chief Executive Officer ("CEO") of Newmont. According to the Company' March 11, 2024, Proxy Statement on Schedule 14(a), "[a]s President, CEO, and a member of the Board of Directors, Mr. Palmer is responsible for setting and overseeing the Company's strategic direction, operating results, organizational health, culture, ethics and compliance, and corporate responsibility."

17.    Defendant Natascha Viljoen ("Viljoen") was, at all relevant times, Executive Vice President and Chief Operating Officer ("COO") of Newmont. According to the Company' March 11, 2024, Proxy Statement on Schedule 14(a), "[a]s [COO], Ms. Viljoen serves as a member of Newmont's executive leadership team that sets the strategic direction for the Company. As of year-end 2023," the Proxy continued, "Ms. Viljoen was responsible for leading the mine operations in

Australia, Latin America and Caribbean, North America, and Papua New Guinea, as well as overseeing Global Projects."

18.　Defendant Karyn F. Ovelmen ("Ovelmen") was, at all relevant times, the Executive Vice President and Chief Financial Officer ("CFO") of Newmont. According to the Company' March 11, 2024, Proxy Statement on Schedule 14(a) "[a]s [CFO], Ms. Ovelmen serves as a member of Newmont's executive leadership team that sets the strategic direction for the Company. Ms. Ovelmen leads the Company's financial planning and analysis, accounting, controller, tax, treasury, and internal audit functions, as well as oversees investor relations and enterprise risk management."

19.　Defendant Peter Toth ("Toth") was, at all relevant times Newmont's Chief Development Officer, a member of Newmont's executive leadership team that sets the strategic direction for the Company. Toth was responsible for leading the development of Newmont's mid- and long-term strategy, as well as leading the corporate development, commercial, and external relations functions.

20.　Defendants Palmer, Viljoen, Ovelmen, and Toth are sometimes referred to herein as the "Individual Defendants." Newmont together with the Individual Defendants are referred to herein as the "Defendants."

21.　The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Newmont reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed

5

from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.    Newmont is liable for the acts of its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

23.    The scienter of the Individual Defendants, and other employees and agents of the Company, are similarly imputed to Newmont under *respondeat superior* and agency principles.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Newmont's Business

24.    In its Annual Report on Form 10-K for the year ended December 31, 2023, filed with the SEC on February 29, 2024, ("2023 10-K"), Newmont describes the Company as "primarily a gold producer with significant operations and/or assets in the United States, Canada, Mexico, Dominican Republic, Peru, Suriname, Argentina, Chile, Australia, Papua New Guinea, Ecuador, Fiji and Ghana. At December 31, 2023," the 2023 10-K continued, "Newmont had attributable proven and probable gold reserves of 135.9 million ounces, attributable measured and indicated gold resources of 104.8 million ounces, attributable inferred gold resources of 69.1 million ounces, and an aggregate land position of approximately 24,900 square miles (64,400 square kilometers)." In addition to gold, Newmont produces "copper, silver, lead, and zinc." Defendants describe the Company "[a] the world's leading gold company, . . . committed to creating value and improving lives through sustainable and responsible mining."

25.     According to the 2023 10-K, with respect to its competition, Defendants boasted of high-quality assets and lower than average all-in sustaining costs ("AISC")[1], stating:

> The top 10 producers of gold comprise approximately twenty-five percent of total worldwide mined gold production. We currently rank as the top gold producer with approximately five percent of estimated total worldwide mined gold production. Our competitive position is based on the size and grade anchored in our ore bodies anchored in a large portfolio of Tier 1 assets located in favorable mining jurisdictions. A Tier 1 asset is defined as having, on average over such asset's mine life: (1) production of over 500,000 GEO's/year on a consolidated basis, (2) **average AISC/oz in the lower half of the industry cost curve**, (3) an expected mine life of over 10 years, and (4) operations in countries that are classified in the A and B rating ranges for Moody's, S&P and Fitch.
>
> We have a diverse portfolio of mining operations with varying ore grades and cost structures. **Our costs are driven by the location, grade and nature of our ore bodies, and the level of input costs, including energy, labor and equipmen**t. The metals markets are cyclical, and our ability to maintain our competitive position over the long term is based on our ability to acquire and develop quality deposits, hire and retain a skilled workforce, and to manage our costs.

### 1.     Production of Gold and Other Metals

26.     Newmont primarily produces gold but also other metals. Per industry standard, Newmont uses the mining industry term "gold equivalent ounces" ("GEOs") to express the value of gold production alongside other mined materials, like silver, copper, or zinc. Newmont expresses GEOs by converting the revenue from these other metals into an equivalent amount of gold, based on their respective market prices. The GEOs of those non-gold materials can be added to the amount of gold produced to create an overall total of GEOs. According to the 2023 10-K, "Newmont has developed gold equivalent ounces ("GEO") metrics to provide a comparable basis for analysis and

---

[1] AISC is a metric used by gold mining companies to calculate the cost of their operations. AISC consists of cash costs, sustaining capital, exploration expenses, and general and administrative expenses. AISC per ounce quantifies how much it costs to extract each ounce of gold from a particular mine.

understanding of our operations and performance related to copper, silver, lead and zinc." Moreover, the 2023 10-K continued, the Company calculates GEOs "as pounds or ounces produced multiplied by the ratio of the other metals' price to the gold price, using the metal prices" for copper, silver, lead, and zinc.

27.     Newmont's 2023 10-K described gold process as follows. For context, "tailings" are those materials left over after the process of separating gold (or another valuable metal) from ore.

**Gold and Other Metals Processing Methods**

Doré. Gold is extracted from naturally-oxidized ores by either milling or heap leaching, depending on the amount of gold contained in the ore, the amenability of the ore to treatment and related capital and operating costs. Higher grade oxide ores are generally processed through mills, where the ore is ground into a fine powder and mixed with water into a slurry, which then passes through a carbon-in-leach circuit to recover the gold. Lower grade oxide ores are generally processed using heap leaching. Heap leaching consists of stacking crushed or run-of-mine ore on impermeable, synthetically lined pads where a weak cyanide solution is applied to the surface of the heap to dissolve the gold contained within the ore. In both cases, the gold-bearing solution is then collected and pumped to process facilities to remove the gold by collection on carbon or by zinc precipitation.

Gold contained in ores that are not naturally-oxidized can be directly milled if the gold is liberated and amenable to cyanidation, generally known as free milling ores. Ores that are not amenable to cyanidation, known as refractory ores, require more costly and complex processing techniques than oxide or free milling ore. Higher grade refractory ores are processed through either roasters or autoclaves. Roasters heat finely ground ore to a high temperature, burn off the carbon and oxidize the sulfide minerals that prevent efficient leaching. Autoclaves use heat, oxygen and pressure to oxidize sulfide ores.

Some gold sulfide ores may be processed through a flotation plant. In flotation, ore is finely ground, turned into slurry, then placed in a tank known as a flotation cell. Chemicals are added to the slurry causing the gold-containing sulfides to attach to air bubbles and float to the top of the tank. The sulfides are removed from the cell and converted into a concentrate that can then be processed in an autoclave, roaster, or fine grinding circuit to recover the gold through leaching. Gold-bearing solution is then plated onto cathodes in an electrowinning process or

8

precipitated using zinc powder. In both cases, the precipitate is melted with fluxes in a furnace to produce doré.

Concentrate. Sulfide ore is delivered to a crushing and grinding plant which feeds a sulfide processing plant. The sulfide processing plant primarily comprises lead and zinc flotation stages. In the lead and zinc flotation, the slurry is conditioned with reagents to activate the desired minerals and produce lead and zinc concentrate. The lead concentrate is highly enriched in gold and silver, with a smaller fraction of the precious metal recovered in the zinc concentrate. The resulting concentrate is sold to smelters or traders for further processing.

Ore containing copper and gold is crushed to a coarse size at the mine and then transported via conveyor to a process plant, where it is further crushed and then finely ground as a slurry. The ore is initially treated by successive stages of flotation resulting in a gold/copper concentrate containing approximately 10% to 26% copper. The flotation tailings have a residual gold content that is recovered in either a carbon-in-leach circuit or is dewatered and loaded onto trucks for transportation off-site.

Ore containing silver and gold is crushed to a coarse size at the mine and then transported via conveyor to a process plant, where it is further crushed and then finely ground as a slurry. The ore is initially treated by successive stages of flotation resulting in a gold-silver concentrate. The flotation tailings have a residual gold content that is recovered in either a carbon-in leach circuit or is dewatered and loaded onto trucks for transportation off-site. The gold-silver concentrate is further refined in the gold room to produce gold-silver doré.

## 2.    Costs associated with mining

28.    The Company also describes the costs associated with production of gold and GEOs. A principle non-GAAP[2] measure for assessing the costs to produce gold ounces or GEOs is "AISC" or all-in sustaining costs. According to Endnotes to Defendants' February 29, 2024, First Quarter 2024 Investor Presentation ("1Q2024 Investor Presentation"), Slide 47, "AISC or all-in sustaining cost is a non-GAAP metric. AISC as used in the Company's outlook is a forward-looking statement and is therefore subject to uncertainties." Defendants continued:

_____

[2] GAAP are generally accepted accounting principles.

AISC a non-GAAP metric defined as the sum of cost applicable to sales (including all direct and indirect costs related to current gold production incurred to execute on the current mine plan), remediation costs (including operating accretion and amortization of asset retirement costs), G&A, exploration expense, advanced projects and R&D, treatment and refining costs, other expense, net of one-time adjustments, sustaining capital and finance lease payments.

29.    Explaining the need for reporting actual and estimated AISC, the 2023 10-K states:

Current GAAP measures used in the mining industry, such as cost of goods sold, do not capture all of the expenditures incurred to discover, develop and sustain production. Therefore, Newmont calculates All-In Sustaining Costs ("AISC") based on the definition published by the World Gold Council. . . .

AISC is a metric that expands on GAAP measures, such as cost of goods sold, and non-GAAP measures, such as costs applicable to sales per ounce, to provide visibility into the economics of our mining operations related to expenditures, operating performance and the ability to generate cash flow from our continuing operations. We believe that AISC is a non-GAAP measure that provides additional information to management, investors and others that aids in the understanding of the economics of our operations and performance compared to other producers and provides investors visibility by better defining the total costs associated with production.

30.    The Company claims to adjust certain GAAP and non-GAAP measures in determining its AISC. According to the 2023 10-K, the components include, among others, costs applicable to sales ("CAS"), among others. The 2023 10-K defined CAS as:

Costs applicable to sales. Includes all direct and indirect costs related to current production incurred to execute the current mine plan. We exclude certain exceptional or unusual amounts from CAS, such as significant revisions to recovery amounts. CAS includes by-product credits from certain metals obtained during the process of extracting and processing the primary ore-body. CAS is accounted for on an accrual basis and excludes Depreciation and amortization and Reclamation and remediation, which is consistent with our presentation of CAS on the Consolidated Statements of Operations. In determining AISC, only the CAS associated with producing and selling an ounce of gold is included in the measure. Therefore, the amount of gold CAS included in AISC is derived from the CAS presented in the Company's Consolidated Statements of Operations less the amount of CAS attributable to the production of other metals. The other metals' CAS at

10

those mine sites is disclosed in Note 4 of the Consolidated Financial
Statements. The allocation of CAS between gold and other metals is
based upon the relative sales value of gold and other metals produced
during the period.

31.     In addition, with respect to CAS, the 2023 10-K provides tables, reconciling non-

GAAP measures to the most directly comparable GAAP measures, explaining:

> Costs applicable to sales per ounce/gold equivalent ounce are non-
> GAAP financial measures. These measures are calculated by dividing
> the costs applicable to sales of gold and other metals by gold ounces or
> gold equivalent ounces sold, respectively. These measures are
> calculated for the periods presented on a consolidated basis. We believe
> that these measures provide additional information to management,
> investors and others that aids in the understanding of the economics of
> our operations and performance compared to other producers and
> provides investors visibility into the direct and indirect costs related to
> production, excluding depreciation and amortization, on a per
> ounce/gold equivalent ounce basis. Costs applicable to sales per
> ounce/gold equivalent ounce statistics are intended to provide
> additional information only and do not have any standardized meaning
> prescribed by GAAP and should not be considered in isolation or as a
> substitute for measures of performance prepared in accordance with
> GAAP. The measures are not necessarily indicative of operating profit
> or cash flow from operations as determined under GAAP. Other
> companies may calculate these measures differently.

**B.     Newmont Focuses on Tier 1 Assets**

**1.     Tier 1 Assets**

32.     In the 1Q2024 Investor Presentation, Slide 46, Defendants described a Tier 1 asset

> as having, on average over such asset's mine life: (1) production of
> over 500,000 GEO's/year on a consolidated basis, (2) average AISC/oz
> in the lower half of the industry cost curve, (3) an expected mine life
> of over 10 years, and (4) operations in countries that are classified in
> the A and B rating ranges for Moody's, S&P and Fitch. For the
> definition of GEOs and AISC, see Newmont's annual report on Form
> 10-K on file with the SEC. With respect to other assets in the industry,
> such terms and metrics are as published in public filings of the third
> party entities reporting with respect to those assets. Our methods of
> calculating operating metrics, such as AISC, and those of third parties
> may differ for similarly titled metrics published by other parties due to
> differences in methodology.

33.    In the 2023 10-K, Defendants described Newmont as ". . . the top gold producer with approximately five percent of estimated total worldwide mined gold production. Our competitive position is based on the size and grade of our ore bodies anchored in a large portfolio of Tier 1 assets located in favorable mining jurisdictions."

34.    In May 2023, Defendants announced that they had reached a deal to acquire a portfolio of Tier 1 assets from Newcrest, a deal that closed on November 6, 2023. According to the 2023 10-K, this acquisition caused Newmont's Board of Directors to engage in a strategic review as follows:

> Based on a comprehensive review of the Company's portfolio of assets following the Newcrest acquisition, the Company's Board of Directors approved a portfolio optimization program to divest six non-core assets and a development project in February 2024. The non-core assets to be divested include Akyem, CC&V, Éléonore, Porcupine, Musselwhite, Telfer, and a development project in Canada. In February 2024, the Company concluded that these non-core assets and the development project met the accounting requirements to be presented as Held for Sale in the first quarter of 2024, based on progress made through our active sales program and management's expectation that the sale is probable and will be completed within 12 months. As of December 31, 2023, the aggregate net book value of the non-core assets and the development project was $3,419[,000,000].

### 2.    The Newcrest acquisition

35.    In an April 10, 2023, press release, Defendants disclosed that "Newmont Corp. . . submitted a revised non-binding indicative proposal to the Board of Directors of Newcrest Mining Limited (Newcrest) to acquire 100 percent of the issued share capital of Newcrest . . . . The Newcrest Board of Directors," the press release continued, "agreed to grant Newmont confirmatory due diligence access to enable Newmont to put forward a binding proposal. Due diligence is expected to be completed within approximately four weeks." Newcrest has indicated that it intends to grant exclusivity to Newmont during the due diligence period, with the terms of that exclusivity still to be agreed. Newcrest will also undertake confirmatory due diligence on Newmont during this period."

12

36.     In that April 10, 2023, press release, Defendant Palmer stated "[w]e are entering a new era in which mining companies must hold themselves to a higher standard of sustainability and long-term value creation." He continued, "[t]his transaction would strengthen our position as the world's leading gold company by joining two of the sector's top senior gold producers and setting the new standard in safe, profitable and responsible mining." Defendant Palmer concluded that "[t]ogether as the clear gold-mining leader, we would be well-positioned to generate strong, stable and lasting returns with best-in-class sustainability performance for decades to come."

37.     During an April 27, 2023, conference call about the possible merger of Newcrest into Newmont, Defendant Palmer stated, "[o]n April 10th, the Newcrest Board then agreed to grant Newmont access to confirmatory due diligence to enable us to put forward a binding proposal. . . ." Palmer added that "[b]ut I want to be clear with everyone on today's call, that we will continue to be disciplined as we work through the due diligence process and determine synergies, and we will act in the best interest of our shareholders."

38.     Also on that April 27, 2023, conference call analyst Jackie Przybylowski asked about the timing of the transaction's close and the prospects for integration. In response, Defendant Palmer stated, "[w]e're certainly in due diligence, so first and foremost, we'll go through that due-diligence process as an exclusivity period for four weeks, but we will remain disciplined in terms of understanding that information and assessing that and making our judgments and decisions." Defendant Palmer continued, indicating that due diligence was "a core capability of Newmont." He continued, praising Newmont's "operating and technical teams," concluding, "So when it comes to due diligence, we have a very strong team who is very experienced in doing this work. So we are applying the full force of the Newmont organization on this due diligence exercise."

39.     Again, according to Defendant Palmer, Defendants had access to and "bor[ed] through" the data room Newcrest had established, scrutinizing resource models, mine plans, and other

13

source documents to assess fair value. In addition, he stated, "[s]o as we think about due diligence and site visits, folks like Rob, Aaron Puna, Dean Gehring, all of my team with Bernard Wessels, Mia Gous, Francois Hardy, so all very senior operational leaders at the site." About site visits, Defendant Palmer continued, ". . . having senior leaders on the ground, any day to spend a day, but you learn a lot walking around an operation within a day in terms of the culture in that operation, in particularly, the safety culture. And that is a very important part of our due diligence process . . . ."

40.    In a May 14, 2023, press release, Defendants announced that having completed due diligence, Newmont had entered a definitive agreement to acquire Newcrest. In a presentation that day, defendants claimed to "[f]urther strengthen[] Newmont's position as the responsible gold mining leader through the combination of high-quality operations, projects and reserves concentrated in low-risk jurisdictions, including 10 Tier 1 operations that will support decades of safe, profitable and responsible gold and copper production. The combination of Newmont and Newcrest," the announcement continued, quoting Defendant Palmer, "represents an exceptional value proposition for shareholders and other stakeholders. It creates an industry-leading portfolio with a multi-decade gold and copper production profile in the world's most favorable mining jurisdictions." In that same announcement, Defendant Palmer described Newmont's due diligence process as "robust, . . . identifying a number of opportunities to unlock substantial value and will apply our experience and expertise to Newcrest's complementary and exceptional portfolio of long-life, low-cost gold and copper assets."

41.    During a May 15, 2023, conference call about Newmont's acquisition of Newcrest, supporting the quality of the due diligence Newmont conducted, Defendant Palmer stated, "[a]s an important part of our due-diligence process over the last four weeks, we had key members of our executive team lead site visits." Defendant Palmer disclosed that "Dean Gehring led the visit to Brucejack and Red Chris in Canada" and "Aaron Puna to Lihir in Papua New Guinea." Palmer

14

continued that "[t]heir insights were key inputs to developing our synergies and how we plant to

integrate Newcrest operations into our portfolio and operating model."

42.    According to the 2023 10-K, "on November 6, 2023, Newmont closed its acquisition

of Newcrest following receipt of all regulatory approvals and approval by Newmont's and Newcrest's

shareholders . . . respectively. The Newcrest transaction," Defendants continued, "could subject us to

significant risks, including those described below. In particular, the 2023 10-K stated:

> We may not realize the anticipated benefits of the Newcrest transaction
> and the integration of Newcrest and Newmont may not occur as
> planned.
>
> The Newcrest transaction was pursued with the expectation that its
> implementation will result in an ***increase in sustained profitability,
> cost savings and enhanced growth opportunities for Newmont***. These
> anticipated benefits will depend in part on whether Newcrest's and
> Newmont's operations can be integrated in an efficient and effective
> manner. The on-going integration of the two companies will present
> challenges to management, including the integration of systems and
> personnel of the two companies which may be geographically
> separated, anticipated and unanticipated liabilities, unanticipated costs
> (including substantial capital expenditures required by the integration)
> and the loss of key employees.
>
> The performance of operations could be adversely affected if, among
> other things, Newmont is not able to achieve the anticipated savings
> and synergies expected to be realized in entering the Newcrest
> transaction, or retain key employees to assist in the integration and
> operation of Newcrest and Newmont. The integration of Newmont and
> Newcrest may pose special risks, including one-time write-offs,
> restructuring charges and unanticipated costs. In addition, the
> integration process could result in diversion of the attention of
> management and disruption of existing relationships with suppliers,
> employees, customers and other constituencies of Newmont. Although
> Newmont and its advisors have conducted due diligence on the
> operations of Newcrest, there can be no guarantee that Newmont is
> aware of any and all liabilities of Newcrest. For example, the
> compliance mechanisms and monitoring programs adopted and
> implemented by Newcrest prior to the Newcrest transaction may not
> adequately prevent or detect possible violations of environmental,
> health and safety, taxes, employment, labor standards, money
> laundering, terrorist financing and other applicable laws and failure by
> Newcrest to comply with any of the foregoing legislation prior to the

15

Newcrest transaction could result in severe criminal or civil sanctions and may subject Newmont to other liabilities, including fines, prosecution and reputational damage, all of which could have a material adverse effect on the business, consolidated results of operations and consolidated financial condition of Newmont. As a result of these factors, it is possible that certain benefits expected from the Newcrest transaction may not be realized.

### 3.    The Tier 1 Assets Newmont Acquired From Newcrest

43.    Among the Tier 1 assets Newmont acquired from Newcrest were Lihir, in Papua New Guinea, and Brucejack in Northwest Canada. In conversations with investors after the Newcrest acquisition closed, Defendants boasted about the Newcrest acquisition. As such, prior to the Class Period, analysts questioned Defendants about production assumptions and Newmont's ability to reduce costs at the Tier 1 assets Newmont acquired from Newcrest.

### a)    Lihir

44.    About Lihir the 2023 10-K described:

Lihir, Papua New Guinea. (100% owned) Lihir is an open pit mine located near the town of Londolovit on Lihir Island, approximately 560 miles (900 kilometers) northeast of Port Moresby, the national capital. Access to Lihir Island is through the Kunaye airport located approximately 4 miles (7 kilometers) north of the mine. Newcrest acquired the Lihir mine in 2010. Newmont obtained the 100% ownership of Lihir when Newmont acquired Newcrest in 2023. The Lihir deposit is considered to be an example of an epithermal gold deposit. Lihir Island is part of a 155 mile (250-kilometers) long, northwest-trending, alkalic volcanic island chain that sits within an area where several micro-plates (Solomon Sea Plate, South Bismarck Plate and North Bismarck Plate) developed between the converging Australian and South Pacific plates. Lihir Island comprises two Plio–Pleistocene volcanic blocks, Londolovit Block and Wurtol Wedge and three Pleistocene volcanic edifices, Huniho, Kinami, and Luise. Lihir consists of a granted Special Mining Lease, two granted Mining Leases, one granted Exploration License, five granted Leases for Mining Purposes, and three Mining Easements held in the name of Lihir Gold. The total area under license is approximately 63,506 acres (25,700 hectares). Lihir is situated on land held variously under customary, State of PNG, and private ownership, including under State of PNG lease. The bulk of the land that is or will be affected by development, operations and closure of the Lihir Operations is

customary owned. Newmont has been granted rights to undertake mining and processing of gold and related activities, through negotiations with the state and local government, and landowners in the area. Environment Permits for water extraction and waste disposal are in place to support mining operations. The Londolovit River is the main source of water for the process plant and surrounding area. A 2% royalty is payable to the State on the realized prices of all gold and silver bullion sold. In addition, a production levy of 0.5% is also payable to the PNG Mineral Resource Authority on the gross income from the sale of the minerals (i.e., excluding the offsets of treatment and refining charges, payable terms and freight) and other income derived from or in connection with the mining operations. Operations at Lihir are conducted using a fleet of seven shovels and 49 haul trucks, with payload ranging from 85 to 135-tonnes. The process plant consists of crushing and grinding followed by partial flotation, pressure oxidation, and recovery of gold from washed oxidized slurry using conventional cyanidation. For tailings management, Lihir utilizes deep-sea tailings placement in a suitable deep-ocean location. The plant has undergone a number of alterations and expansions since first commissioning in 1997. Lihir's gross property, plant and mine development at December 31, 2023 was $2,645[,000,000]. As of December 31, 2023, Lihir reported 17.5 million ounces of gold reserves. As of December 31, 2023, Lihir reported 20.2 million ounces of gold resources.

45.    About Lihir, the 2023 10-K describes performance issues, disclosing:

In 2023, Lihir's performance was impacted following extreme rainfall limiting pit access and causing material handling issues at the crushers. Lihir has also experienced reduced milling rates due to limited raw water supply to the plant driven by drought conditions experienced across the New Ireland Province in PNG. Lihir continues to progress options to improve its water management resilience, including improving its internal water recycling and identifying additional water sources and storage options. . .

46.    On February 22, 2024, Defendants convened an earnings conference call ("2023 Earnings Call") to discuss Newmont's fiscal 2023 results and, in particular, the integration of and expectations for the operations Newmont acquired from Newcrest. In their prepared remarks during the 2023 Earnings Call, about Lihir, Defendant Viljoen stated:

As a result, we are entering the year with a strong focus on integration and the safe delivery of our targets. Our success in 2024 will be largely determined by the performance of our 6 managed Tier 1 operations,

17

Boddington, Tanami, Penasquito, Ahafo, Lihir and Cadia, not underestimating the significant impact of the delivery from the full portfolio of operating assets.

47.     Also during the 2023 Earning Call, analysts focused on Lihir, questioning Defendants about why Newmont believed it could improve upon Lihir's operations. Daniel Edward Major of UBS Investment Bank asked:

> Questions around some of the Newcrest assets observing, I guess, from a distance company for quite a long time. Two things, the Lihir asset has been a perennial underperformer ever since Newcrest barter, why do you think you're going to be able to deliver better results and more consistent results at Lihir than the Newcrest were able to over the last 10 years or so?

48.     In response, Defendant Palmer stated:

> Daniel, . . . Lihir is a big asset developed by, [indiscernible] Mining and then Newcrest picked it up kind of a dozen years ago. A big mine like Lihir is best placed in a big Tier 1 portfolio, we were able to balance out the ebbs and flows of a large complex mine. So first and foremost, you can with Lihir in a balanced portfolio with 9 other Tier 1 operations, you can develop strategic life of mine plans to optimize the value and allow the ebb and flow of gold production that flows from that as you were through the mining cycle to be appropriately managed. That'd be my first observation.

> A second observation that [indiscernible] suffered from being a cash-generating asset in a small portfolio. Therefore, there haven't been the appropriate time and attention on equipment reliability, base fixed and mobile. We're getting after that this year. There's also complexity in that mine plan that we believe can be simplified as we think about how we present the different types of ore and [indiscernible] the materials handling that all through a complex processing plan [indiscernible]. And we see real opportunities there as well.

> And one data point, Daniel, that I'd put out there for you One [indiscernible] doesn't make a spring. But as we are in the 3 months that we've had Lihir in the Newmont portfolio, and we've worked with the team there, the dedication of our [indiscernible] or on the ground Managing Director to build a 2024 mine plan and budget that they can get after. The Lihir in the month of January, better plan for the first time in 4 years. And the cultural change and the moral that comes to be able to set a time to get after that feeds on itself, and we see a real opportunity to set the Lihir, so stretching the [indiscernible] targets for

them to hit the marks and they get the confidence that they can do things because they set in Newmont portfolio and they were able to give it the support and attention that it deserves. And so hopefully that gives you some color for how we're thinking about the year.

49.     On April 25, 2024, Defendants convened an earnings call to discuss Newmont's results for the first quarter of fiscal 2024, ended March 31, 2024 ("1Q2024 Earnings Call"). In prepared remarks, about Lihir, Defendant Palmer stated:

> At Lihir, we recently completed the first phase of full potential from which we have identified initiatives that will deliver more than $150 million of value close to double the synergy target we allocated to this new Tier 1 operation in our portfolio. I've just returned from Lihir and the key to extracting this value will be simplification. Following a very similar approach to the 1 we used at Penasquito 5 years ago. We have key members of our Newmont technical team on the ground in P&G supporting the site team to work on simplifying operations by focusing on the areas that would genuinely move the needle and stopping the non-value activities that have historically played this operation.
>
> One example of this work is the work we are doing to debottleneck the materials handling and crushing circuits, which have been limited by Lihir's different oil properties, resulting in downtime from spillage, block shoots and block crushes. From this initiative alone, we expect to improve mill throughput and generate over $50 million in annual cash flow improvements and the future waves of opportunities already identified at Lihir we remain very excited about the untapped potential at this Q1 operation.

50.     Also, during the 1Q2024 Earnings Call, Defendant Viljoen discussed Newmont Management's focus on Lihir, stating:

> Tom and I visited a Lihir in early April, and we're impressed with the team's dedication and understanding and then implementing full potential work. As Tom said, this work will focus on simplifying the operation and being clear on the highest value option that will drive stability through the mining value chain. In addition, I want to flag that the largest of our 4 autoclave [sic] at Lihir will come down in quarter 3 for planned maintenance. This shutdown is included in our guidance.

51.     In colloquy during the 1Q2024 Earnings Call, about Lihir, Defendants boasted about a full potential program to achieve synergies, manifesting their understanding and focus on the Tier

19

1 projects they acquired like Lihir. Analyst Jackie Przybylowski of BMO Capital Markets Equity

Research asked about the benefits that newly acquired sites could achieve from implementing what

she called the "full potential program," which she understood had benefited Newmont's Penasquito

project. In response Defendant Palmer boasted of management's understanding of Lihir, stating:

> Yes. Jackie. I'll kick off and Natascha you might want to build on that
> a little bit degearing in there as well, and I want to chip in as well. We're
> further -- most advanced at Lihir and Lihir was where we saw the most
> opportunity, which is why we jumped into the -- literally on day 1. 3
> main productivity and cost opportunities at Lihir. The 1 I mentioned in
> the prepared remarks, it's really around consistent for the so that you
> can manage and address materials handling.
>
> So sure, you've got the right balance of different ores so that you've got
> managing conveyer belts and block shoots and block crushers just to
> allow a big plan to get a good consistency coming into it. It's a key
> value driver. Asset management and improving plant availability and
> other plant losses, a real opportunity at Lihir just the basics of wood
> quality work management reliability engineering with the strength of
> the team that we have to support Lihir.

52.    On July 24, 2024, Defendants issued a press release announcing Newmont's results

for the second quarter of 2024 ended June 30, 2024 (the "2Q2024 Press Release"). The following

day, Defendants convened a conference call to discuss these results ("2Q2024 Earnings Call"). In

prepared remarks, Defendant Palmer discussed synergies, Defendants' thorough understanding of

what they had purchased, and their focus on the former Newcrest properties including Lihir and

Brucejack, stating:

> Looking at the 3 components of our synergy delivery, and starting with
> full potential. We are now advancing into the delivery stage of the
> initiatives we have identified at Lihir, Cadia and Red Chris, with the
> largest value drivers coming from our 2 new Tier 1 assets in Lihir and
> Cadia. On our call last quarter, we provided an update on the
> opportunities we have identified at Lihir. In this quarter, I'll briefly
> describe some of the opportunities we see in front of us at Cadia. We
> recently completed our full potential diagnosis phase at Cadia, from
> which we have identified a series of initiatives that are expected to
> deliver more than $100 million of value by the end of next year.

During this first phase, we had a team of experts from Newmont's Global Technical Services group working to support the site to identify opportunities to higher production and improve cash flows. As one example of this, and through collaboration with Boddington, Cadia is working to optimize the output from its high pressure riding roll circuit in the mill. With these HPGR improvements, Cadia will be able to lift its mill feed by approximately 80 tonnes an hour or more than 600,000 tonnes a year, implementing the initiatives we have identified and leveraging the experience we have gained over the last 10 years with our Full Potential program. We are working with the team at Cadia to increase average mill throughput to 34 million tonnes per annum representing a meaningful step up in productivity from this world-class gold and copper asset. With Lihir, Cadia and Red Chris all now entering the delivery phase of full potential, we are on track to meet our initial $200 million commitment.

53.    Also, in prepared remarks during the 2Q2024 Earning Call, about Lihir, Defendants

Valjoen stated:

And finally, at Lihir, second quarter production decreased from the first quarter primarily due to heavy rainfall, which contributed to soft ground conditions that in turn impacted mine sequencing. Production levels are expected to remain consistent in the third quarter as the site commences a planned 120-day shutdown of the primary autoclave. And just to bring the autoclave shutdown into perspective, the process includes not only shutting down the autoclave itself, but also removing the brick layer at [indiscernible] membrane, inspecting the 5.5-meter diameter steel shell, applying a high-temperature tolerant membrane and rebricking the 48-meter long structure, which is nearly the length of a new Olympic swimming pool. Once complete, we anticipate gold production will return to normal levels in the fourth quarter, positioning Lihir for a strong finish to the year. Taking everything into account, we anticipate an increase in gold production mix quarter, setting us up to deliver Lihir's higher production in the fourth quarter.

Our performance in the second half of the year will be driven by higher grades at Penasquito, hafo and Tanami, improved throughput[3] from Lihir and Boddington, along with an expected improvement from our non-managed operations.

---

[3] In this case, "throughput" refers to the amount of material (ore, waste rock, etc.) that a mining operation can process within a specific timeframe, typically measured in tons per day or per year. It essentially defines the "speed" or capacity at which the mine can extract and handle material.

54.    Lastly, one month into 3Q2024, during the 2Q2024 Earnings Call, in colloquy, Defendants discussed the anticipated autoclave shut down at Lihir as follows:

Robert Alan Brackett
Sanford C. Bernstein & Co., LLC., Research Division

A bit in the weeds around Lihir. Trying to understand the cadence of the shutdown and the guidance. So there's roughly 5 months left in the year. The shutdown is 4 months, but we should think about volumes as being sort of evenly split first half and second half. Are all 4 other claims being shut down? Or is it in series or parallel? Or how do I think about that cadence?

Thomas Ronald Palmer
President, CEO & Director

[indiscernible] is the largest of the 4 autoclaves, represents 40% of the throughput. So still at other 3 autoclaves running, you get some more recoveries running through those other 3 autoclaves. So the guidance for Lihir for the year respected that the largest of the autoclaves being down from 120 days shut. And then that you're obviously going to see that impact through predominantly the third quarter and into the start of the fourth. So we're certainly reflecting the impact of that shutdown for Lihir this year in sudden. I think Natascha said in her prepared remarks, the third quarter is similar to the second quarter, and then you'll see the fourth quarter higher as you get that autoclave up and running again with Lihir. It's not too far of being 50-50 waiting for the year as a consequence of that.

55.    In the Quarterly Report on Form 10-Q for the period ended March 31, 2025, filed with the SEC on April 24, 2025 ("1Q2025 10-Q"), about Lihir's production, Defendants reported, "[g]old production decreased 9% primarily due to lower mill throughput and lower mill recovery, partially offset by higher ore grade milled." About costs, Defendants reported "[c]osts applicable to sales per gold ounce increased 8% primarily due to lower gold ounces sold and higher materials costs. . . . All-in sustaining costs per gold ounce increased 7% primarily due to higher Costs applicable to sales per gold ounce."

56.    Former Employees of Lihir confirm that Newmont knew well prior to the Class Period that operations at Lihir were troublesome, preventing increased production and reduction of AISC.

For example, FE1 served as the Senior Shutdown Coordinator at Lihir for Newcrest from July 2021 through November 2023, and then for Newmont from November 2023 to November 2024. FE1 reported to Newcrest Superintendent Keith Wigram who moved over to Newmont during the acquisition. Wigram reported to Brian Berney, a General Manager from Newmont.[4] A shutdown coordinator is responsible for the planning, execution, and oversight of shutdowns, which are temporary suspensions of mining operations for maintenance, repairs, upgrades, or emergencies.

57.    FE1 scheduled coordinated shutdowns of Lihir in order to perform major maintenance. When operations stopped, FE1 coordinated the work performed during these shutdowns, including all logistics at the site. FE1's main concern was the safety of the department performing the work as well as prioritizing the health and safety of all employees. They safeguarded the site, ensuring it was in good working condition and that equipment was functioning efficiently. When management switched off machines, FE1 managed a team that ensured the plant was securely shut down so that maintenance could be completed. This included handling confined spaces with high voltage.

58.    FE1 was familiar with Lihir and the issues Newmont faced there. Initially, according to FE1, Newmont's efforts to comprehend Lihir's operations occurred somewhat belatedly, following the acquisition. Notwithstanding Newmont's claim to have performed robust due diligence at Lihir, according to FE1, Newmont management was unaware before the acquisition of machinery breakdowns, ocean dumping, and, despite a bunker, the potential for waste to overflow into the pond which fed back into the tanks.

---

[4] According to FE4, who served at Newmont as a Project Mine Manager, Underground through December 2023 and reported directly to Brian Berney, Newmont transferred Berney to serve as General Manager at Lihir on December 1, 2023. Berney informed FE4 that Newmont was conducting a broad review of Lihir.

59.     FE1 had firsthand knowledge of the autoclaves at Lihir.[5] When asked, he stated that Lihir's autoclaves experienced significant issues. According to FE1, Lihir had four autoclaves in total. FE1 recalls that Autoclave 4 had been out of operation for 2 or 3 years and was considered a disaster, while the others frequently failed to operate properly. Indeed, Autoclave 4 did not operate for an entire year before the Newmont acquisition and had been down since 2022. FE1 attributed these problems to management issues and the lack of proper maintenance. Autoclaves consistently broke down and experienced sudden power losses and load shifts. Due to their position, FE1 monitored the issues with the autoclaves closely. More, it was not just the autoclaves but also the grinding machines at Lihir—Machines 1 and 2—that often broke down or ran with difficulty.

60.     According to FE1, Lihir was not profitable. The mine's operational costs were high due to outdated equipment and low output, which led to improbable production forecasts. FE1 considered Newmont's projected gold production levels questionable. Additionally, during the acquisition, even as Newmont labeled Lihir a Tier 1 asset, according to FE1, it did not meet the forecasted expectations. Even as FE1 noted that Newmont should have identified these issues had they conducted comprehensive due diligence, Lihir's problems soon became evident once Newmont assumed control of the mine.

61.     In addition to autoclaves, according to FE1, other essential equipment at Lihir was outdated and problematic, hampering profitability. For example, the Motor Control Center ("MCC") was problematic from both safety and reliability perspectives. FE1 also worked closely with the

---

[5] An autoclave is a strong heated container used for chemical reactions and other processes using high pressures and temperatures, e.g. steam sterilization. In gold mining, autoclaves are used in a process called pressure oxidation (POX) to extract gold from refractory ores. These ores contain gold encased in sulfide minerals, making it difficult to recover gold using traditional methods like cyanide leaching. The autoclave process involves subjecting the ore slurry to high temperature and pressure, typically with oxygen, to break down the sulfide minerals and release the gold. This pre-treatment makes the gold amenable to subsequent extraction through conventional methods like cyanidation.

power utilities department to address High Voltage ("HV") power concerns, noting that the MCC contained substantial HV equipment that posed safety risks. FE1 reported that Switchboard 930 at the substation frequently experienced failures. Additionally, a mine shutdown occurred when a breaker tripped, which can cause an explosion if relays are damaged.

62.     Recently, it was noted that switchboard feeds were changed in the mine area. Maintenance had been scheduled by Lihir, but the company extended the required maintenance period from five years to ten years. FE1 emphasized that all equipment and machinery have maintenance due dates, and Newmont/Newcrest compromised safety and risk plans by declaring the equipment and machinery safe to run.

63.     According to FE1, Newmont knew of these issues, establishing a new reliability plan during the 2024 transition to ensure the safety of all personnel. According to FE1, even though Newmont knew that a total plant shutdown was necessary in 2024, they postponed it until March 2025, undermining safety. The 1Q2025 10-Q mentions no shutdown at Lihir.

64.     FE2 worked at Lihir for both Newcrest and Newmont from 2015 through March 2025. As a Permit to Work Supervisor, FE2 was responsible for ensuring that safety risks were assessed and safety measures considered. According to FE2, they were in charge of ensuring all work conducted at the Lihir site and within the plant was carried out responsibly and maintained in a safe manner. They managed the workforce on-site, including those working in the mines, on the equipment, and within the infrastructure. FE2 reported to Thomas Grubb, Manager-Power and Utilities.

65.     Confirming FE1, according to FE2, the Lihir mine was designed to produce over 1 million ounces of gold annually but consistently fell short due to frequent electrical system failures and other machinery breakdowns. Based on former co-workers still at Lihir, FE2 relates that

significant breakdowns continue to impact the site. Last year, these issues caused operations to decline significantly.

66.    To manage breakdowns effectively, FE2 reported, a strategy that minimizes their frequency and impact is essential. According to FE2, however, Newmont lacked such a strategy or plan, leading to poor performance. Typically, planned shutdowns of a mine should occur perhaps once a year for repairs, updates, and improvements, ensuring efficient operation. According to FE2, however, due to frequent breakdowns, Lihir had to shut down the mine every three months, sometimes closing it for a whole day depending on the severity of the issue.

67.    Confirming FE1, FE2 stated that Lihir suffered from persistent, adverse autoclave issues during FE2's tenure. FE2 recalls frequent breakdowns, with some lasting months, including their last six months there. According to FE2, Lihir had too many mills and processors, and inadequate power.

68.    Having been at Lihir since 2015, with ten years at Newcrest and Newmont, including seven years focused on mine processes around the mills and autoclaves, FE2 recalls that Lihir autoclaves and other faulty equipment lacked reliability, rendering Lihir prone to persistent breakdowns that materially reduced gold production. FE2 stated that poor machinery and electrical systems were mainly to blame. For example, according to FE2, while Autoclave #4, the largest in the Southern Hemisphere, had the potential to handle substantial workloads, it did not because it never functioned properly. According to FE2, while Autoclave #4 had been designed to contribute to one million ounces of annual gold production, it actually was completely offline far more than it was online, a major failure.

69.    According to FE2, other issues hampered gold production at Lihir. For example, Lihir used steam through a jet oil compressor to generate power for the mine. It was efficient and cost-effective, and the initial plan for its use revealed low operational costs. According to FE2, however,

26

even as Lihir had used steam to power the mines since 2004, Newmont terminated it when managers convinced Newmont to shut it down due to cost and safety concerns. According to FE2, however, cost and safety concerns alone did not drive that decision. Rather, Newmont management lacked the necessary skills and maintenance strategy for the mine. According to FE2, his manager, Wingfield Kila, persuaded the Brian Berney, general manager at Lihir, to shut it down, citing maintenance issues rather than safety concerns.

70. FE2 raised engineering reliability issues in daily meetings with Lihir management, including Grubb. FE2 conveyed that the main fuel supply line to the generators had significant reliability issues, leading to its offline status for a year. This left only one tank supplying fuel. Without redundancy, a problem with the working tank would mean a mine shutdown. More, according to FE2, the auto tank has been under maintenance for over a year, since Newmont assumed control.

71. Lihir experienced a complete power shutdown for two weeks about a month ago. According to FE2, the power bus, the main highway and essential for distribution, had performance issues. Even as FE2 reported these issues multiple times, Newmont never addressed them.

72. Thus, from before the Class Period, Defendants knew or should have known that Lihir suffered from material problems with its equipment and management, rendering gold production unreliable and AISC subject to frequent, material increases.

**b) Brucejack**

73. In addition, Newmont acquired Brucejack from Newcrest. About Brucejack, the 2023 10-K described:

> Brucejack, Canada. (100% owned) Brucejack, located in western British Columbia, approximately 40 miles (65 kilometers) north of Stewart and 28 miles (45 kilometers) southwest of the Stewart-Cassiar Highway 37, is an underground operation. The Brucejack operation comprises four mining leases and six core mineral claims which cover 8,169 acres (3,306 hectares) and 337 mineral claims covering 298,795 acres (120,918 hectares). The mining leases expire in 2045. Brucejack

27

is a deformed, porphyry-related transitional to intermediate sulphidation epithermal high-grade gold-silver deposit. Gold is hosted in quartz-calcite vein stockworks, sheeted veins and veinlets and can also be associated with arsenian pyrite. Process facilities include a mill building containing process equipment, including a rock bin, SAG mill-ball mill circuit followed by conventional flotation, concentrate dewatering, concentrate load-out and tailings dewater operations, a water treatment plant, a paste backfill plant, and a metallurgical laboratory. The mining fleet includes a fleet of load-haul-dump vehicles, trucks for material loading and transport to surface, excavators, bolters, shotcrete sprayers, long-hole drills, and cable bolters. Brucejack's gross property, plant and mine development at December 31, 2023 was $2,910[,000,000]. Brucejack reported 3.1 million ounces of gold reserves at December 31, 2023.

74.    During the 2023 Earnings Call, an analyst asked about the potential in the "Golden Triangle," an area in the Canadian province of British Columbia well-known for rich mineral deposits, particularly gold, silver, and copper. The analyst asked, "[e]ven as you guys talked about the potential in the Golden Triangle area, no plan set out here, but can you talk a little bit about how you see that? How that region evolves over the next few years?" Defendant Palmer responded:

> Yes. Thanks, Carey. . . . I actually have a couple of trips up there sadly over the last couple of months. Real potential at Brucejack to ***get a really solid understanding of that ore body*** in life and they have a contributing nice cash for quite some time to come from a nice ore body and exploration potential around that Valley of the Kings area. So a really nice, really nice gold opportunity there."

75.    Thus, in February 2024, having conducted due diligence on Brucejack and having owned it for over 3 months, Defendants committed themselves in the short term to understanding the operations at Brucejack, touting its opportunities.

76.    During Defendants' 1Q2024 Earnings Call, in prepared remarks, Defendant Palmer stated about Brucejack:

> We are also well into the first phase of our full potential work at Cadia, Red Chris and Brucejack and have already identified several high-value opportunities that we will progress in parallel with the initiatives now underway at Lihir. For our supply chain synergies we have already realized close to $30 million from negotiating more favorable terms

28

and pricing for materials and equipment as well as first consolidating
and then renegotiating service contracts.

77.     Aside from commenting on the December 2023 death of a Brucejack employee,
Defendants did not discuss Brucejack further during the 1Q2024 Earnings Call. Even as Defendants
listed Brucejack as a material, purported Tier 1 project, Defendants did not mention it at all during
Defendants' 2Q2024 Earnings Call.

78.     Former employees confirm serious operational and grade issues at Brucejack from
before Newmont acquired it. For example, FE3 was Manager of Strategic Geology at Newcrest Mines
before moving to the same position at Newmont following the November 2023 acquisition. They
were with Newmont from November 2023 to October 2024 working from Vancouver, Canada. At
Newmont, they reported to Chief Geologist/Head of Resource Management Arja Jewbali.

79.     According to FE3, they worked at Pretium Resources Inc. from August 2018 to
February 2022 as the Manager of Geological Operations. Notably, Pretium previously operated
Brucejack when Newcrest acquired Pretium in 2022. FE3 continued to work at Brucejack through
both acquisitions. FE3's primary focus was on site-based operations. FE3 recalls that Arja Jewbali
reported to Francois (Hardy) until Hardy's promotion. Afterwards, Jewbali began reporting through
the Exploration Group. Generally, FE3 focused on forward-looking resource and reserve statements
while overseeing the day-to-day operations of geologists, data management, and planning at
Brucejack. They also acted as Melbourne's liaison in Vancouver and vice versa.

80.     According to FE3, Newmont focused on developing Tier 1 mines. According to FE3,
based on their extensive experience at that location, Brucejack did not qualify as a Tier 1 mine.
Although the Brucejack mine had significant prospects, FE3 believes that Newmont's overarching
ambition to add Tier 1 mines caused them to rush the due diligence process. According to FE3

Newmont management spent insufficient time inspecting/touring the mines and only conducted their first thorough technical tour in December 2023.

81.    According to FE3, Brucejack never achieved the production targets of 550,000 gold ounces per year. This was the amount required for Tier 1 status that Newmont set. Instead Brucejack produced only 325,000 ounces at best. Despite its high grade, Brucejack production showed significant variability. According to FE3, Defendant Palmer felt Brucejack had Tier 1 potential due to its location in what he termed Newmont's Golden Triangle alongside Red Chris and Galore Creek Exploration. Palmer made these statements both publicly and internally.

82.    According to FE3, in its haste, Newmont's original Brucejack assessment overlooked material issues requiring significant time and expense to correct, in turn resulting in material unexpected capital expenditures. For example, Brucejack had an access road over a glacier that required immediate repair and restoration, which represented a significant expense.

83.    In addition to material capital expenditures, according to FE3, Brucejack experienced significant variability in gold production at the mine, creating boom-or-bust potential in quarterly earnings results.

84.    With respect to costs, although Newmont knew about Brucejack's cost variability and its impact on cash flows, it was surprised by Brucejack's G&A costs. For example, according to FE3, due to the large snowfalls near Brucejack, Brucejack must maintain a large workforce of people for labor-intensive tasks such as clearing snow from roofs and roadways to ensure transportation routes remain open. Additionally, avalanche experts are constantly required on staff to maintain safe mining operations. These special workforce requirements increase Brucejack's ongoing G&A costs.

85.    Last, according to FE3, at Brucejack, additional concerns included a unique power line through the coastal mountains. Despite having diesel backup, prolonged power outages lasting up to 8-10 days frequently occurred, negatively impacting operations. While the mills remained

operational with the diesel backup power, production and processing shortcuts were necessary, frequently leading to production and earnings shortfalls from forecasted results. This could happen several times a year due to weather conditions.

86.    More, correcting their Class Period material misrepresentations and highlighting their recklessness, during an earnings call to discuss Newmont's results for the third quarter of fiscal 2024, ended September 30, 2024 ("3Q2024 Earnings Call"), Defendants Valjoen stated:

> at Brucejack, *we have taken a step back this year to do the development and drilling work to ensure that we improve our knowledge of this nuggety ore body*. We continue to experience periods of exceptional high grades, including a 1-day average of 52 grams per ton last month and an average of over 20 grams per ton in the same week. *As a result of the work we are doing, we anticipate that the gold production next year from Brucejack will also be largely consistent with this year, all around 100,000 ounces lower than our initial guidance for 2025 that we provided back in February*.

(Emphasis added).

87.    "Nuggety" refers to the Geological Nugget Effect. The nugget effect is a geostatistical term that refers to the variability of grade within an orebody. An orebody with a high nugget effect has extremely high variability of grade[6] within it. Narrow vein structures are often characterized by a high geological nugget effect. The combination of an irregular distribution of gold throughout mineralization and the uncertainty associated with the location of the mineralization within the host rock contribute to the difficulty in characterizing its overall grade. Simply stated, where metals such as gold cluster in a given deposit, drill cores which intersect a nugget can vastly overestimate the orebody's aggregate grade. Conversely, drill cores which do not intersect high grade nuggets will underestimate the amount of metal in the general ore body.

---

[6] "Grade" or "grading" refers to the concentration of valuable minerals within the ore body, often expressed as a percentage or grams per tonne, indicating how much of the desired material is present in the mined rock. High-grade ore contains a larger proportion of the valuable mineral, making it more profitable to extract.

88.    Brucejack is well known in the industry as an unusually extreme heterolithic deposit with virtually unprecedented nugget effect.[7] By stating that Newmont would step back and do the development and drilling at Brucejack, after a supposedly thorough due diligence process before purchasing Newcrest and having owned Brucejack for well over eight months, Valjoen admitted that Defendants forecasted production and costs at Brucejack with materially insufficient understanding of the deposit's true composition. Moreover, Defendants still believed considerable time and cost would need to be devoted to develop sufficient understanding of the Brucejack deposit to attempt to mine it to its full potential.

89.    According to Newmont's Report on 2024 mineral reserves, "[p]roven and probable reserves are based on extensive drilling, sampling, mine modeling and metallurgical testing from which Newmont determined economic feasibility." To assess reserves, as frequently as monthly, Newmont engaged in reconciliation drilling, a process mining companies employ, comparing predicted geological models with actual mining and processing results to assess and improve the accuracy of resource estimation and operational efficiency.

90.    Reconciliation drilling is critical for monitoring how expectations for gold grade and tonnage are aligning with the ore Newmont actually extracts and processes. By implementing robust reconciliation practices and leveraging appropriate drilling and sampling techniques, gold mining operations can improve the accuracy of their predictions, optimize their processes, and enhance their overall performance and profitability. Thus, even if Newmont was unaware of the challenges that faced the Newcrest properties it purchased in November 2023, reconciliation drilling during 2024

---

[7]    https://northernminer.com/news/strathconas-farquharson-responds-to-pretiums-bulk-sample-result/1002752061/ "Heterolithic" in mining refers to the interbedded nature of deposits containing varying sediment types like sand and mud, which has implications for resource characterization, hydrogeology, engineering considerations, and exploration efforts

necessarily alerted Defendants to issues with respect to production at Brucejack no later than July 24, 2024.

91.    In addition, in the 2023 10-K, Defendants claimed:

> The Company has internal controls for reviewing and documenting the information supporting the mineral reserve and mineral resource estimates, describing the methods used, and ensuring the validity of the estimates. Information that is utilized to compile mineral reserves and resources is prepared and certified by appropriately qualified persons at the mine site level and is subject to our internal review process which includes review by the Newmont-designated site and the Qualified Person ("QP") based in our corporate office in Denver, Colorado. Additionally, all material sites are audited every three years and the non-material sites on a four-year cycle by subject matter experts for compliance to internal standards and guidelines as well as regulatory requirements. The QP presents the mineral reserve and mineral resource information to the Audit Committee and the Disclosure Committee on an annual basis for further review.

92.    Defendants stated clearly in their Q42023 Earnings Call that the single greatest priority at the recently acquired Brucejack mine was to "get a really solid understanding of that ore body." While defendants failed to update shareholders on these ongoing efforts during Newmont's Q12024 and Q22024 Earnings Calls, Defendants' activities such as reconciliation drilling and reworking of the Brucejack resource model uncovered early in 2024 that they had overstated the proven and probable reserves in the Brucejack deposit as of year-end 2023.

93.    Defendants failed to inform shareholders of the questionable nature of Brucejack's resource model until the 3Q2024 conference call. In Newmont's 2024 year-end Resource Statement, the full extent of Brucejack's overstated proven and probable reserves was finally revealed. Defendants cut the total tonnage in the Brucejack resource model 25% (from 11.5 million tonnes to 8.6 million tonnes), the deposit grade was cut 18% (from 8.44 grams per tonne to 6.95 grams per tonne), and total proven and probable reserves were slashed by an eye-opening 39% (from 3.1 million ounces to 1.9 million ounces). For their steep reserve restatement, Defendants blamed "unfavorable

net revisions of 1.5 million ounces due to updated resource model assumptions, including tighter drill hole spacing requirements and other technical considerations."

94.    In Newmont's 2024 year-end Reserve Statement, Defendants also slashed Lihir's proven and probable reserves by 10% (from 17.5 million ounces to 15.8 million ounces), stating "favorable price related revisions of 1.8 million ounces (net of cost escalation assumptions) were offset by unfavorable net revisions of 2.9 million ounces, largely due to pit design updates and geotechnical changes."

95.    Even if Defendants lied about the due diligence they conducted at Brucejack and Lihir, by no later than the first half of 2024, having completed their own reconciliation drilling and other analyses, Defendants were severely reckless in disregarding that the Brucejack and Lihir deposits had proven and probable reserves that were materially lower than they had believed in later 2023 and that both projects would produce less gold and GEOs over the near and medium terms. Defendants failed to update shareholders in a timely manner about Newmont's reconciliation processes and the resultant decline in proven and probable reserves at Brucejack and Lihir.

96.    The following chart demonstrates the precipitous decline in metrics for the Brucejack and Lihir projects, in particular, showing that what Newmont purchased from Newcrest in late 2023 would yield materially less production than Defendants led investors to believe. Reconciliation drilling and other analyses alerted Defendants to these materially less robust proven and provable reserves by no later than July 2024:

| Statistic | Brucejack | Lihir | Cadia | Red Chris Open Pit | Red Chris Underground |
|---|---|---|---|---|---|
| 2023 Tonnage (000 tonnes) | 11,500 | 217,100 | 1,102,300 | 30,200 | 171,700 |
| 2023 Grade (g/tonne) | 8.44 | 2.51 | 0.42 | 0.37 | 0.64 |
| 2023 Ounces (000) | 3,100 | 17,500 | 14,700 | 300 | 171,700 |
| | | | | | |
| 2024 Tonnage (000 tonnes) | 8,600 | 203,000 | 1,051,800 | 14,700 | 171,700 |
| 2024 Grade (g/tonne) | 6.95 | 2.41 | 0.42 | 0.39 | 0.64 |
| 2024 Ounces (000) | 1,900 | 15,800 | 14,100 | 100 | 171,700 |
| | | | | | |
| 2024/2023 Tonnage | -25% | -6% | -5% | -51% | 0 |
| 2024/2023 Grade | -18% | -4% | 0% | 5% | 0 |
| 2024/2023 Ounces | -39% | -10% | -4% | -67% | 0 |

97.    In Newmont's 3Q 2024 earnings conference call, Defendants materially reduced production guidance by 100,000 ounces of gold per year, and admitted further development would be necessary to further develop mine stopes[8] at Brucejack. Defendants also materially reduced production guidance for Lihir by 250,000 ounces. To investors and analysts in the mining industry, "further development" is code for "we did not properly understand the true composition of the deposit and we will need significant drilling and development work to allow mining stopes to achieve their anticipated productivity." These additional mine development programs will significantly increase AISC. Given the well-known nature of Brucejack's nuggety composition, either Defendants were reckless in their due diligence or irresponsible in not sharing Brucejack risks with shareholders.

**C.    Defendants Focus on Increasing Production and Decreasing Costs**

98.    During the 2023 Earnings Call, Defendant Palmer described the Company's "Commitments to Investors," a plan for transforming Newmont into the world's best mining company. During the 2023 Earnings Call, in prepared remarks, Palmer stated:

> But before we do that, I would like to describe how we're transforming our business into a unique collection of the world's best gold and copper operations and projects following last year's transaction. When we announced our binding agreement to acquire Newcrest in May last

---

[8] Mine stopes are underground excavations where ore is extracted. It is essentially a large, open space created within a mine to remove the desired mineral deposit. Stoping is the process of creating these excavations and removing the ore.

year, we outlined a powerful value proposition built around 4 key commitments. First, to set the new sustainability standard and strengthened Newmont's position as the gold sector recognize sustainability leader.

Second, to create the industry's strongest portfolio of world-class gold and copper assets in the most favorable mining jurisdictions. Third, to deliver $500 million of annual synergies and realize over $2 billion in cash from portfolio optimization. And finally, to continue driving a disciplined, balanced approach to capital allocation.

After closing the transaction on November 6 last year, the integration of the 5 new operations into our Newmont operating model has been progressing very well. And as we enter this critically important year of integration and transformation, I'll be holding myself and my executive leadership team accountable for delivering on these commitments and this will be our key focus in 2024.

To support this work, earlier today, we announced 4 key actions that together will enhance our ability to deliver on our clear and consistent strategy. First, we plan to divest 6 high-quality but noncore assets this year. From this point forward, our world-class portfolio will consist entirely of Tier 1, an emerging Tier 1 operations and districts. And it will have a significant exposure to growth in copper and gold from our industry-leading organic project pipeline. Second, we provided our 2024 and 5-year outlook, getting a clear picture of the work we're doing today to expand margins and appropriately sequence our projects to deliver sustainable value.

Third, with the clarity, simplicity and focus that our Tier 1 portfolio provides, we have committed to deliver a further $500 million in cost and productivity improvements across the entire portfolio. And these improvements are over and above our synergy commitment from the Newcrest acquisition. We expect to hit this $500 million annual run rate of improvement by the end of 2025. And finally, we announced a balanced shareholder return framework, consisting of $1 per share annualized base dividend and a new $1 billion share repurchase program.

Our go-forward Newmont portfolio is focused on Tier 1, gold and copper, operations and projects located in the world's most favorable mining jurisdictions. And it has 4 key features. First, it contains 10 Tier 1 operations, representing all the half of the world Tier 1 guidelines in the Newmont portfolio. Second, it has 3 emerging Tier 1 operations that each has a clear path for growth. And we have the opportunity to create a Tier 1 district in British Columbia, a district in which Newmont will be operating for at least the next [indiscernible]. And third, it has

36

an unmatched organic development pipeline with 6 large-cale top of gold projects. And fourth, underpinning our Tier 1 portfolio, is the industry's most robust foundation of reserves and resources.

Going forward, Newmont has the industry's largest gold resource base and we also have the largest base of copper resources in the gold industry. To put these numbers into perspective, Newmont has an almost 30% large gold reserve resource base than our nearest peer. And we have a 40% larger copper reserve resource base than our nearest gold peer. No other gold producing in the world can offer the depth and quality that Newmont's Tier 1 portfolio can today.

Later on, I'll provide a little bit more color about Newmont's longer-term outlook and the exciting gold, copper opportunities ahead of us. But first, I'd like to step back and give some insight into how we are framing the year ahead.

2023 brought with a number of unique challenges, which are now certainly behind us. The 120-day labor dispute at Peñasquito, asset integrity issues that were inherent in the original design of equipment at Ahafo and wildfires in Canada impacting Éléonore. Those 3 events, mean that our final production number did not reflect the full capability of our assets.

As we emerge on the other side of these events, I am proud of the decisions that we took to protect the long-term interest of our company rather than looking to seek short-term experience solutions. However, I'm also not happy with the underlying level of our operating performance. We have the opportunity to improve our compliance to mine plants to improve our fixed and mobile equipment reliability and to improve our mill throughputs and recoveries. So our focus to '24 will be on safely integrating new teams, new operations in our Newmont operating model and culture, transforming our portfolio, underlying the groundwork for sustainable operating performance, margin expansion and strong returns.

99.     On that same 2023 Earnings Call, Defendant Viljoen 2023 discussed Defendants'

intense focus on the performance of all of Newmont's properties. She stated:

This year, we will have a laser focus on the performance of our 11 managed operations in our go-forward portfolio, while also guiding our 6 noncore assets through a safe and productive process for divestment. As we work to deliver efficiency and reliability from our global portfolio, we are committed to progressing our 4 key projects in execution and keeping them on track in 2024.

As a result, we are entering the year with a strong focus on integration and the safe delivery of our targets. Our success in 2024 will be largely determined by the performance of our 6 managed Tier 1 operations, Boddington, Tanami, Penasquito, Ahafo, Lihir and Cadia, not underestimating the significant impact of the delivery from the full portfolio of operating assets.

*** 

Now bringing all of this together, as we focus on the integration and size delivering this year, we expect our Tier 1 portfolio to produce around 5.6 million ounces of gold and an all-in sustaining cost of $1,300 per ounce. Combined with the very significant 1.9 million gold equivalent ounces from copper, silver, lead, zinc and molybdenum. Our unit costs are expected to improve compared to 2023 due to steady production of net volumes and the delivery of synergies and full potential improvements with the lowest unit cost coming from Newmont's managed Tier 1 portfolio.

100.    According to the 2023 10-K, Defendants define "free cash flow" as:

Free Cash Flow

Management uses Free Cash Flow as a non-GAAP measure to analyze cash flows generated from operations. Free Cash Flow is Net cash provided by (used in) operating activities less Net cash provided by (used in) operating activities of discontinued operations less Additions to property, plant and mine development as presented on the Consolidated Statements of Cash Flows. The Company believes Free Cash Flow is also useful as one of the bases for comparing the Company's performance with its competitors. Although Free Cash Flow and similar measures are frequently used as measures of cash flows generated from operations by other companies, the Company's calculation of Free Cash Flow is not necessarily comparable to such other similarly titled captions of other companies.

The presentation of non-GAAP Free Cash Flow is not meant to be considered in isolation or as an alternative to net income as an indicator of the Company's performance, or as an alternative to cash flows from operating activities as a measure of liquidity as those terms are defined by GAAP, and does not necessarily indicate whether cash flows will be sufficient to fund cash needs. The Company's definition of Free Cash Flow is limited in that it does not represent residual cash flows available for discretionary expenditures due to the fact that the measure does not deduct the payments required for debt service and other contractual obligations or payments made for business acquisitions. Therefore, the Company believes it is important to view Free Cash

Flow as a measure that provides supplemental information to the
Company's Consolidated Statements of Cash Flows.

The following table sets forth a reconciliation of Free Cash Flow, a
non-GAAP financial measure, to Net cash provided by (used in)
operating activities, which the Company believes to be the GAAP
financial measure most directly comparable to Free Cash Flow, as well
as information regarding Net cash provided by (used in) investing
activities and Net cash provided by (used in) financing activities.

101.    During the 2023 Earning Call, about improving margins and generating strong free

cash flow, Defendant Palmer stated:

Newmont go forward Tier 1 portfolio sets the new standard for gold
and copper mining and provides our shareholders with exposure to the
highest concentration of Tier 1 assets in the sector, located in the most
favorable mining jurisdictions, and with improving cost profile to
maximize margins and generate strong free cash flow. The industry-
leading growth optionality in copper and gold through disciplined
reinvestment and project execution and a balanced shareholder return
framework.

As we look forward to this very important year of integration and
transformation, I am very confident in the quality of our assets and the
capability of our team to deliver on our commitments and justify our
position as the benchmark gold equity. This year, we'll also be
continuing to work on transforming our go-forward portfolio and
importantly, building out the strategic and life-of-mine plans for each
of our managed sections.

102.    As companion to the 2023 Earnings Call, Defendants provided a slide presentation in

which they represented their strategy from the Newcrest acquisition on, including expanding margins

and a commitment to productivity improvements.



103.    In addition, Defendants provided a slide, summarizing their guidance for 2024.



104.    Indeed, in that February 2024 slide presentation, Defendants broke down production and cost guidance for 2024 by site.



105.    Similarly, with respect to margins expansion and costs, the February 2024 slide presentation provided near-term and long-term guidance for what Defendants purportedly projected as decreasing AISC over time.

106.    Among the means of reducing costs and rationalizing operation of the new, Tier 1 focused Newmont, the February 2024 slide presentation presented Defendants' purported projection of synergies they could deliver through 2025.



107.    Later, with respect to synergies, during the 2Q2024 Earnings Call, Defendants

discussed completing certain in-depth reviews of the sites they had purchased. For example,

Defendant Palmer stated:

> During this first phase, **we had a team of experts from Newmont's**
> **Global Technical Services group working to support the site to**
> **identify opportunities to higher production and improve cash flows**.
> As one example of this, and through collaboration with Boddington,
> Cadia is working to optimize the output from its high pressure
> [g]ri[n]ding roll circuit in the mill.[9] With these HPGR improvements,
> Cadia will be able to lift its mill feed by approximately 80 tonnes an
> hour or more than 600,000 tonnes a year, implementing the initiatives
> we have identified and leveraging the experience we have gained over
> the last 10 years with our Full Potential program. We are working with
> the team at Cadia to increase average mill throughput to 34 million
> tonnes per annum representing a meaningful step up in productivity
> from this world-class gold and copper asset. **With Lihir, Cadia and**
> **Red Chris all now entering the delivery phase of full potential, we are**
> **on track to meet our initial $200 million commitment**." (Emphasis
> added).

---

[9] High-pressure grinding rolls ("HPGRs") offer an energy-efficient comminution method for gold
mining, enhancing throughput and sustainability by reducing bottlenecks and energy costs associated
with traditional milling. HPGRs apply high pressure to break down ore through inter-particle
crushing, which is more energy-efficient than traditional methods like ball milling.

108.     Even later during the Class Period, Defendants described their in-depth reviews of newly acquired assets during the September 17, 2024, Denver Gold Forum. According to Defendant Valjoen:

> So firstly, when I think about our new assets, I can't think about it without stepping back and looking at the full portfolio of assets because what it enabled for us is to really step back and turn these inside -- these assets inside out in a way that we haven't done before, because we have the opportunity now to look at this entire portfolio of assets. The flexibility that we can build in our operational performance and how we think about our sustaining capital profile and staging that to ensure that we have a stable ounce profile and a sustainable -- sustainable capital profile. When we consider the full potential program on the new assets, particularly, we've run all 4 assets that will remain in the portfolio now through our full potential program. And that is -- all of those are in execution at the moment. We have committed $200 million are as part of the synergies that will come from that process, and we're well on track."

109.     Thus, by the beginning of the Class Period, eight months after closing the Newcrest acquisition, Defendants conveyed to the market that they had an in-depth understanding of the upside and the downside of each of the Tier 1 assets Newmont acquired from Newcrest. With this knowledge, Defendants expressed confidence in their ability to increase gold production and decrease costs over the five-year guidance period of 2024 through 2028.

## V.     FALSE AND MISLEADING STATEMENTS[10]

110.     In Newmont's 2Q2024 Press Release, issued July 24, 2024 and filed with the SEC the same day, about gold production, Defendants stated:

> Attributable gold production1 decreased 4 percent to 1,607 thousand ounces from the prior quarter primarily due to lower production at Cerro Negro as a result of the suspension of operations during the quarter following the tragic fatalities of two members of the Newmont workforce on April 9, 2024. Operations at Cerro Negro safely resumed on May 24, 2024. In addition, operations were suspended as of April 14, 2024 at Telfer, one of Newmont's non-core assets, as further work

---

[10] Statements alleged to be false and misleading are bolded and italicized. The rest of the statements are provided for context.

is completed to remediate the safe operation of the tailings storage facility. ***Second quarter production was also impacted by lower production at Lihir due to heavy rainfall impacting mine sequencing,*** as well as lower production at Akyem due to lower grades as a result of the ongoing stripping campaign. These impacts were partially offset by higher production at Porcupine, Brucejack and Peñasquito.

***Full year production for 2024 is expected to be second-half weighted as previously indicated, with a sequential increase weighted towards the fourth quarter. The second-half weighting is expected to be driven primarily by*** improved grades at Peñasquito, Ahafo and Tanami, ***improved throughput from Lihir*** and Boddington and sequential improvements delivered from our non-managed joint venture operations.

111.    The foregoing statements about improved throughput from Lihir and 2024 gold production generally were materially false and misleading. Through their reconciliation processes and lower production rates, twenty-four days into the 3Q2024, Defendants knew or recklessly disregarded that production problems such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow had already materially impacted Lihir's performance as to both reliability and safety.

112.    About AISC, in the 2Q2024 Press Release, Defendants stated, "Gold AISC per ounce increased 9 percent to $1,562 per ounce compared to the prior quarter ***primarily due to higher CAS and higher sustaining capital spend.***"

113.    The foregoing statement about AISC was materially false and misleading. Even as Defendants disclosed rising AISC in 2Q2024, they failed to disclose that they knew or recklessly disregarded material problems at Lihir and Brucejack relating to both production and costs had caused and would continue to cause Newmont to expend more to produce each ounce of gold, materially increasing AISC, contracting Newmont's margins and impacting its profitability for the near-term and the medium-term. By choosing to discuss AISC, Defendants had a duty to disclose these facts.

114.    On July 25, 2024, Defendants convened the 2Q2024 Earnings Call. During prepared remarks, Defendant Palmer stated, "We delivered solid operational performance as planned, ***keeping us firmly on track to achieve our 2024 guidance and positioning us to deliver improving financial results.*** These solid results have also enabled us to progress our capital allocation priorities, which I'll touch on in a moment. With a continued focus on safely delivering, we've also made meaningful progress on the 4 key commitments we made to our shareholders at the start of the year."

115.    The foregoing opinion about Newmont's solid operational performance in the context of Defendants' then-present statement that Newmont was on track to meet their guidance was materially false and misleading because Defendants failed to disclose they knew or recklessly disregarded that material adverse circumstances at Lihir and Brucejack would materially, adversely impact Newmont's production and increase its AISC, contracting margins materially.

116.    Also during the 2Q2024 Earnings Call, in scripted remarks, Defendant Palmer stated:

> Looking at the 3 components of our synergy delivery, and starting with full potential. We are now ***advancing into the delivery stage of the initiatives we have identified at Lihir, Cadia*** and Red Chris, with the ***largest value drivers coming from our 2 new Tier 1 assets in Lihir and Cadia***. On our call last quarter, we provided an update on the opportunities we have identified at Lihir. In this quarter, I'll briefly describe some of the opportunities we see in front of us at Cadia. ***We recently completed our full potential diagnosis phase at Cadia, from which we have identified a series of initiatives that are expected to deliver more than $100 million of value by the end of next year***.

117.    The foregoing statements about advancing into the delivery stage and Lihir and Cadia constituting Newmont's largest value drivers were materially false. Defendants failed to disclose that, by no later than July 24, 2024, Defendants knew or recklessly disregarded production problems and rising AISC at Lihir that had already reduced Newmont's production and decreased its operating margins, materially adversely impacting Newmont's performance for both 3Q2024 and Newmont's near and medium-term financial results.

45

118.    During the 2Q2024 Earnings Call, Defendant Viljoen also delivered prepared remarks, stating:

> Our managed operations delivered solid second quarter results in line with our expectations and outlook for the year. ***With a focus on size and efficient production at each of our managed operations, we are heading into the second half of the year with confidence in our ability to deliver on our business plan and the commitments Tom reiterated earlier.*** And similar to the first half of the year, our operational results in the third and fourth quarters will be largely driven by reduction from our 6 managed Tier 1 operations.

119.    The foregoing statement about efficient production in the context of Defendants' expressing confidence in Newmont's ability to deliver on its business plan was materially false and misleading because Defendants failed to disclose they knew or recklessly disregarded that material production issues plagued at least Newmont's Lihir and Brucejack, factual conditions that undermined the basis of Defendants' statement.

120.    Also during the 2Q2024 Earnings Call, Defendant Viljoen stated:

> And finally, ***at Lihir, second quarter production decreased from the first quarter primarily due to heavy rainfall, which contributed to soft ground conditions that in turn impacted mine sequencing.*** Production levels are expected to remain consistent in the third quarter as the site commences a planned 120-day shutdown of the primary autoclave. And just to bring the autoclave shutdown into perspective, the process includes not only shutting down the autoclave itself, but also removing the brick layer at [indiscernible] membrane, inspecting the 5.5-meter diameter steel shell, applying a high-temperature tolerant membrane and rebricking the 48-meter long structure, which is nearly the length of a new Olympic swimming pool. Once complete, we anticipate gold production will return to normal levels in the fourth quarter, positioning Lihir for a strong finish to the year. Taking everything into account, we anticipate an increase in gold production mix quarter, setting us up to deliver Lihir's higher production in the fourth quarter."

121.    The foregoing statement about heavy rainfall impairing production at Lihir in the context of consistent results in 3Q2024 was materially false and misleading because Defendants failed to disclose that they knew, or recklessly disregarded, no later than July 2024, Lihir had already begun

experiencing material, adverse production issues with both reliability and safety such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow that had materially impaired production, increased AISC, and reduced Newmont's margins.

122.    Defendant Ovelmen also delivered prepared remarks during the 2Q2024 Earnings Call, stating, in material part:

> And whilst we are pleased with the improvement in free cash flow, we are still not satisfied and are working to further improve margins. Looking ahead, we ***anticipate higher free cash flows in the second half of the year driven by increased production values and lower unit costs***, as Tom and Natascha just mentioned. Heading into the second half of the year, we remain firmly on track to achieve our full year guidance of reduction, cost and capital spend. And as Natascha mentioned, production is expected to increase in the third quarter with the year's strongest performance anticipated in the fourth quarter.

123.    The foregoing statements about increased production and lower unit costs in the context of Defendants' efforts to improve margins were materially false and misleading because Defendants failed to disclose they knew or recklessly disregarded that production and cost issues at Lihir (such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow) and Brucejack (nuggety nature of deposits that required further, expensive development of the site) had materially, adversely impacted Newmont's margins and results and would continue impacting for the near-term and medium term.

124.    Concluding Defendants' prepared remarks during the 2Q2024 Earnings Call, Defendant Palmer stated, in material part, ***"[w]e safely delivered solid production as planned, keeping us firmly on track to meet our full year guidance for both ounces and costs."***

125.    The foregoing opinion statement about keeping the Company firmly on track to meet its full-year guidance was materially false and misleading because Defendants failed to disclose they knew or recklessly disregarded that material production issues plagued at least Newmont's Lihir and Brucejack, factual conditions that undermined the basis of Palmer's statement.

47

126.    During the 2Q2024 Earnings call, analysts questioned Defendants about the 2Q2024

results and Defendants' guidance. Scotiabank analyst Tanya Jakusconek asked:

> Okay. As I think about the second half, and I think you mentioned that
> there will be a step-up in production to volume and then stronger
> volumes in Q4, I think about this cost structure because in order for us
> to get these costs down, we do need the volume, number one. And
> obviously, the $130 million in synergies that you mentioned. I'm just
> trying to picture for myself, should I be thinking that the stepup into
> Q3 like almost like 26% of production coming out of the year and then
> 28% in Q4 and $130 million, majority of those savings coming in Q4?
> I'm just trying to understand how I'm going to get to your guidance on
> the costing side with the volume and the synergies and also where the
> $130 million in synergies are coming from, if I can have a breakdown
> of those.

127.    In response to Scotiabank's question, Defendant Palmer falsely stated:

> Think about -- I made the picture this way, and I think you're not too
> far off the mark. You certainly got to see the synergies getting through
> -- particularly those coming from full potential in the fourth quarter as
> those programs get their momentum up. You're certainly going to see
> the highest quarter 4 gold ounces in the fourth quarter. That's from
> some of our key assets that Natascha covered in her comments. The 2
> non-managed joint ventures, so NGM need to deliver on their
> commitments and they've got that strong fourth quarter. ***Our direct
> costs are pretty stable across the year***. And certainly ***what we're seeing
> in the first half flowing through the second half, pretty stable***. So I
> think the picture you're painting in terms of that third quarter weighting
> to the fourth quarter weighting is a reasonable position to be thinking
> about in terms of that weight between the third and the fourth quarter.
> You will see a step up in the third and then a step up into the fourth to
> get to our numbers."

128.    The foregoing then-present statement about cost stability was materially false and

misleading because Defendants failed to disclose they knew or recklessly disregarded that production

and cost issues at Lihir (such as outdated and unreliable machinery, ocean dumping, and potential for

waste overflow) and Brucejack (nuggety nature of deposits that required further, expensive

development of the site) had materially, adversely impacted Newmont's margins and results and

would continue impacting for the near-term and medium term.

48

129.    After the close of trading on July 25, 2024, Defendants filed with the SEC Newmont's

Quarterly Report on Form 10-Q for the period ended June 30, 2024. In the 2Q10-Q, Defendants stated

that "There were no material changes from the risk factors set forth under Part I, Business; Item 1A,

Risk Factors in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, as

filed with the SEC on February 29, 2024." Among the risks in the 2023 10-K to which, Defendants

claimed, there was "no material changes" was the risks of increasing operating costs, stating:

> ***Increased operating and capital costs could affect our profitability.***
> Costs at any particular mining location are subject to variation due to a
> number of factors, such as variable ore grade, changing metallurgy and
> revisions to mine plans in response to the physical shape and location
> of the ore body, as well as the age and utilization rates for the mining
> and processing related facilities and equipment. In addition, costs are
> affected by the price and availability of input commodities, such as
> fuel, electricity, labor, chemical reagents, explosives, steel, concrete
> and mining and processing related equipment and facilities.
> Commodity costs are, at times, subject to volatile price movements,
> including increases that could make production at certain operations
> less profitable. Further, changes in laws and regulations can affect
> commodity prices, uses, and transport. Reported costs may also be
> affected by changes in accounting standards. ***A material increase in
> costs at any significant location could have a significant effect on our
> profitability and operating cash flow.***
>
> ***Our operational costs, including, without limitation, labor costs, can
> be impacted by inflation.*** Certain of our operations are located in
> countries that have in the past experienced high rates of inflation, such
> as in Argentina, Suriname, and Ghana. It is possible that in the future,
> high inflation in the countries in which we operate may result in an
> increase in operational costs in local currencies (without a concurrent
> devaluation of the local currency of operations against the dollar or an
> increase in the dollar price of gold, copper, silver, lead or zinc). ***A
> material increase in costs at any significant location could have a
> significant effect on our profitability and operating cash flow.***
>
> ***We could have significant increases in capital and operating costs
> over the next several years in connection with*** new projects, costs
> related to closure reclamation activities, ***and in the sustaining and/or
> expansion of existing mining and processing operations.*** Costs
> associated with capital expenditures may increase in the future as a
> result of factors beyond our control. ***Increased capital expenditures
> may have an adverse effect on the profitability of and cash flow***

*generated from existing operations,* as well as the economic returns anticipated from new projects. Significantly higher and sustained increases in operational costs or capital expenditures could result in the deferral or closure of projects and mines in the event that costs become prohibitive.

130.    The foregoing risk disclosure about increasing operating costs impacting profitability was materially false and misleading because Defendants failed to disclose they knew or recklessly disregarded that production and cost issues at Lihir (such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow) and Brucejack (nuggety nature of deposits that required further, expensive development of the site) had materially, adversely impacted Newmont's margins and results and would continue impacting for the near-term and medium term such that the risk of increased costs impacting profitability had already materialized.

131.    On September 17, 2024, only thirteen days before the end of Newmont's third quarter, Defendants Viljoen and Ovelmen spoke at the Denver Gold Forum Americas 2024 in Colorado Springs, Colorado. In response to a question about what Newmont management had "learned about the newly acquired assets" and the impact of integrating those assets "in terms of deploying the full potential program just by integrating those assets within Newmont," Defendant Viljoen stated:

> So firstly, when I think about our new assets, *I can't think about it without stepping back and looking at the full portfolio of assets because what it enabled for us is to really step back and turn these inside -- these assets inside out in a way that we haven't done before*, because we have the opportunity now to look at this entire portfolio of assets.
>
> The flexibility that we can build in our operational performance and how we think about our sustaining capital profile and staging that to ensure that we have a stable ounce profile and a sustainable -- sustainable capital profile.
>
> When we consider the full potential program on the new assets, particularly, we've run all 4 assets that will remain in the portfolio now through our full potential program. And that is -- all of those are in execution at the moment. We have committed $200 million are as part

of the synergies that will come from that process, and we're well on track.

But I do want to emphasize that not only through the full potential program, but in stepping back and changing the constraints that we've put on our operations, the constraints that we've put on how we look at our portfolio of assets and how that enterprise have interdependency, ***it is an opportunity for us to make a real step change in productivity, bringing costs down to sustainable low cost base and working towards that economic margin expansion*** that Karyn has been talking about.

132.    The foregoing statements about material changes in productivity, reducing costs, and expanding margins with respect to Newmont's recently acquired Newcrest assets were materially false and misleading. In the context of having conducted a thorough review of the Tier 1 Assets Newmont acquired from Newcrest, including the projects at Brucejack and Lihir, having "turned these assets inside out," Defendants failed to disclose they knew or recklessly disregarded that production and cost issues at Lihir (such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow) and Brucejack (nuggety nature of deposits that required further, expensive development of the site) had materially, adversely impacted Newmont's margins and results and would continue impacting for the near-term and medium term.

133.    In response to Ovelmen's and Valjoen's September 17, 2024, presentation at the Denver Gold Forum, analysts praised the Company. For example, in a September 17, 2024, report, UBS analysts, including Daniel Major, upgraded Newmont to a buy rating calling it their "preferred large cap gold miner. . . ." UBS expressed its belief that among the key drivers for Newmont's success was Lihir. More, UBS believed that Newmont could achieve FY2024 guidance and that post divestment of non-core assets, accelerating de-leveraging and creating cash returns, that Newmont would "have one of the best portfolios in the industry consisting of predominantly large long-life assets in low risk jurisdictions & attractive brownfield growth projects." UBS concluded its

51

September 17, 2024, reports, stating, "[i]f NEM can rebuild investor confidence, we believe it can recapture a valuation premium."

134.    Similarly, in a September 17, 2024, Report, RBC analyst Joshua Wolfson, discussing Ovelmen's and Valjoen's performance at the Denver Gold Forum wrote positively about Newmont, stating:

> • Focused on return on capital invested. NEM outlined the company offered shareholders exposure to a suite of Tier 1 assets, plus a team with the operational/technical excellence, and the discipline to deliver against its plans. Historical industry challenges with generating sufficient returns on capital invested was reviewed, and NEM has a renewed focus on this metric, plus FCF per share growth.
>
> • Carefully evaluating growth. Following the Newcrest acquisition, ***NEM is delivering on its full asset potential program across the new assets***, plus is re-evaluating capital requirements to deliver sustainable production. NEM is advancing four growth projects today (Cadia block caves, Tanami II, Ahafo North, Cerro Negro), and any new projects advanced must create a positive impact and value. Any project advancement requires meeting NEM's technical and economic filters.
>
> • Divestiture process advancing well. In Feb, NEM outlined an objective to raise $2b in proceeds from non-core asset sales, and this process was reviewed as progressing well. Following the recent announcement of the Telfer sale, Akyem is next on track to be completed, and the full process is guided to be completed by the end of 1Q25. Potential acquisitions are a low priority, and capital allocation priorities are firmly focused on the buyback. NEM still sees tremendous value in its shares, and asset disposition proceeds will be directed here. (Emphasis added).

135.    Demonstrating Defendants' recklessness, their bad faith disclosures during 3Q2024, close to and even after the quarter's conclusion, they continued misleading, failing to disclose the truth about Lihir and Brucejack and their drag on Newmont's results both near and medium term. On October 3, 2024, BNP Paribas reported that it had hosted Defendants Palmer and Ovelmen to meet investors in London and Paris. According to BNP Paribas, Defendants Palmer and Ovelmen expressed confidence in delivering on $500 million in synergies from the Newcrest acquisition. In

addition, they expressed no appetite for further acquisition, instead focusing on the assets in Newmont's portfolio and divesting non-core assets.

136.    With respect to delivering on the potential from Newmont's current portfolio of Tier 1 assets, ***near or after the close of 3Q2024***, Defendants Palmer and Ovelmen distributed a chart to BNP Paribas and investors in London and Paris, confirming the production projections that they would effectively disavow in revealing the truth on October 23, 2024, and October 24, 2024. According to BNP Paribas, the chart they distributed to investors showed:



137.    The foregoing chart, virtually identical to the chart Defendants included in their February 2024 Presentation, repeating their February 2024 guidance with respect to production, was materially false and misleading. Defendants failed to disclose that, by the end of 3Q2024, Defendants knew or recklessly disregarded that production and cost issues at Lihir (such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow) and Brucejack (nuggety

nature of deposits that required further, expensive development of the site) had materially, adversely impacted Newmont's margins and results and would continue impacting for the near-term and medium term. Defendants also failed to disclose they knew or recklessly disregarded that because of material issues at Brucejack and Lihir, in particular, gold production was flattening relative to Defendants' February 2024 forecast in the near and medium terms.

138.    That is, at or after the end of 3Q2024, with actual knowledge of flattening production, Defendants distributed to investors and BNP Paribas reproduced a chart that was substantially similar to the chart Defendants distributed as Slide 15 of their February 25, 2024, Investor Presentation of 1Q2024 as follows:



139.    Similarly, with respect to costs, at the very end of 3Q2024, Defendants Palmer and Ovelmen continued to misrepresent that AISC were and would continue declining in 2024 and beyond, distributing the following chart to investors.



140.   The foregoing statements about AISC and production were materially false and misleading. Defendants failed to disclose they knew or recklessly disregarded that production and cost issues at Lihir (such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow) and Brucejack (nuggety nature of deposits that required further, expensive development of the site) had materially, adversely impacted Newmont's margins and results and would continue impacting for the near-term and medium-term. Defendants, therefore, knew or recklessly disregarded that that because of material issues at Brucejack and Lihir, in particular, AISC were not decreasing materially and would not relative to Defendants' February 2024 forecast.

141.   Once again, at or after the end of 3Q2024, with actual knowledge of flattening production, Defendants distributed to investors and BNP Paribas reproduced a chart that was substantially similar to the chart Defendants distributed as Slide 16 of their February 25, 2024, Investor Presentation of 1Q2024 as follows:



142.    In direct response to Defendants false and misleading statements coinciding with the

end of 3Q2024, on October 3, 2024, BNP Paribas rated Newmont "outperform" with a price target of

$65/share. Stating its investment case, it disclosed:

> Newmont is a solid player with the largest gold production footprint.
> Newmont's US primary listing and its membership of the S&P 500
> index should continue to draw both active and passive investors
> towards the stock. Poor operating performance last year with guidance
> downgrades across production/ cost/ project capex did raise question
> marks about future years' consensus earnings/cash flow forecasts. The
> recently completed Newcrest acquisition brings into the portfolio
> additional options for organic growth while also optimising the
> portfolio by shedding short life, smaller assets.
>
> We believe real interest rates peaking will be a positive catalyst for gold
> prices. We find value in the shares on our revised financial estimates
> before the M&A transaction and the achievement of targeted synergies
> would make the investment case even more attractive.

143.    Among the downside risks to investing in Newmont, BNP Paribas stated were

"operational challenges," "higher costs/capex" and "lower production."

144.    Thus, just before and after 3Q2024's close, as they prepared to disclose material operational challenges, materially higher costs, and materially lower production relative to guidance, Defendants directly misled investors.

## VI.    THE TRUTH EMERGES

145.    On October 23, 2024, at 4:05 P.M., after the close of trading, Newmont issued a press release correcting Defendants' previous omission of material problems, announcing disappointing third quarter EBITDA, lower production guidance and an increase in the Company's operating costs, stating Third Quarter 2024 Production and Financial Summary, in relevant part:

> Gold CAS totaled $1.9 billion for the quarter. Gold CAS per ounce3 increased 5 percent to $1,207 per ounce compared to the prior quarter primarily due to higher direct costs at Lihir, as a result of planned autoclave maintenance, as well as higher direct operating costs primarily due to increased contract services across the portfolio.

> Gold AISC per ounce increased 3 percent to $1,611 per ounce compared to the prior quarter primarily due to higher CAS.

> *    *    *

> CAS from other metals totaled $418 million for the quarter. CAS per GEO increased 21 percent from the prior quarter to $1,015 per ounce due to higher costs allocated to co-products at Peñasquito, Cadia, and Red Chris, as well as the impact of the shutdown at Telfer due to the tailings remediation work AISC per GEO increased 11 percent to $1,338 per ounce compared to the prior quarter primarily due to higher CAS from other metals, partially offset by lower treatment and refining costs.

> Net income attributable to Newmont stockholders was $922 million or $0.80 per diluted share, an increase of $69 million from the prior quarter primarily due to higher average realized gold prices and higher sales volumes, partially offset by higher unit costs of production, as well as a loss on assets held for sale of $115 million recognized in the third quarter compared to $246 million recognized in the second quarter of 2024.

146.    On October 24, 2024, at 3:00 P.M., Defendants convened the 3Q2024 Earnings Call. In prepared remarks, Defendant Viljoen commented on Newmont's lower production levels from its new operations, specifically in Lihir and Brucejack, stating, in pertinent part:

> As we look ahead to 2025, our operational focus at Lihir will remain on reducing complexity to deliver more sustainable and predictable results at this Tier 1 operation. ***In the short term, these efforts will result in lower than initially anticipated production next year due to lower throughput to allow for asset reliability improvement work and changes to the mine sequencing, including the establishment of wider ramps to manage surface water and repositioning all roads to be more effective and efficient***.

> Whilst we complete this work, we will be processing a higher proportion of lower grade stockpiles in 2025. And we anticipate that gold production next year from Lihir will be largely consistent with this year's and around 250,000 ounces lower than our initial guidance for 2025 that we provided back in February.

> \*       \*       \*

> Similarly, at Brucejack, ***we have taken a step back this year to do the development and drilling work to ensure that we improve our knowledge of this nuggety ore body***. We continue to experience periods of exceptional high grades, including a 1-day average of 52 grams per ton last month and an average of over 20 grams per ton in the same week. ***As a result of the work we are doing, we anticipate that the gold production next year from Brucejack will also be largely consistent with this year, all around 100,000 ounces lower than our initial guidance for 2025 that we provided back in February***. (Emphasis added).

147.    Defendant Palmer acknowledged that when Defendants guided in February 2024, they did not have a deep understanding of the long-term contributions of the true composition and long-term profit potential of the ore bodies composing leading projects and mines acquired through the Newcrest acquisition. It is clear, however, that no later than July 24, 2024, Defendants had either gained sufficient understanding of Newmont's Brucejack investment or were severely reckless in failing to understand that Brucejack was nuggety, requiring costly development work to better

58

understand its actual long term contribution to production. During Palmer's prepared remarks, he stated:

> We strengthened our balance sheet with $233 million in debt reductions, and we approved an additional $2 billion share repurchase program, bringing our total authorization to $3 billion. ***Having now gained almost a year of experience working with our new operations, we have developed a much deeper understanding of their long-term contribution to our core portfolio and the work needed to create consistent and lasting value for our shareholders***. (Emphasis added).

148. With respect to the future, Defendant Palmer continued, addressing the Company's

increase in direct costs and disappointing production, stating, in relevant part:

> Looking ahead to 2025, we expect gold production from our go-forward Tier 1 portfolio to remain largely consistent with this year, driven by the ***lower than previously expected production from two of our new operations in Lihir and Brucejack.*** We expect unit costs for our core portfolio in 2025 to align with the trends we are observing this year. We also remain committed to the critical tailings work in Cadia, which may result in an annual sustaining capital spend of around $1.8 billion from our core portfolio over the next few years.
>
> ***And we continue to see higher previously expected direct costs and G&A spend***. But with the clarity of our go-forward portfolio, we are now working to manage. With this context, my leadership team and I have a laser focus on the work we need to do to optimize our go-forward portfolio of 11 managed operations and 3 projects in execution. ***Whilst we do anticipate production growth over time, our focus is firmly on expanding margins, generating a strong return on capital invested and creating value versus chasing volume. We are taking a critical look at our organic project pipeline and spending time to ensure that any reinvestment we make into our portfolio is both disciplined and deliberate***. (Emphasis added).

149. During the question-and-answer portion of the call, several analysts questioned

Newmont executives on the Company's change in cost guidance. For example, analyst Daniel

Edward Major of UBS Investment Bank, asked,

> But when I look back to February and you look at your cost profile in medium term, like many in the gold industry, you've got costs coming down over time over the next few years, yet this year, all-in sustaining costs are $100 higher than you saw in February. Is it realistic and

credible to actually assume that unit costs will moderate over time? Or should we rather be assuming the best case outcome is limiting inflation?

150.  In response to the question from UBS analyst Major, Defendant Palmer responded:

Certainly, if I think about the gold industry, there's always been a strong correlation between gold price and the cost of producing an ounce of gold, given that inflation is one of those key structural elements behind the gold price. So as you look forward, if gold price eases, then you'd expect the cost of producing an ounce to ease. And obviously, you're going to see some tracking between the cost per ounce and the gold price. Our focus is on what we're putting in place is that we have 11 managed operations going forward where we're going to be in a position to be looking over the long term and strengthening and growing those margins.

The other comment I'd make before I pass to Karyn, if you wanted to build on that, is when you look at the out-year numbers that we had provided back in February, that assumed 0 escalation. And so when you think about any forward-looking numbers, there's no escalation. And obviously, what we're seeing as we are closer to 2025, the run rates we're seeing as we close out this year and that is going to flow into next year as we understand the cost for the next 12 to 15 months.

151.  Also in response to UBS analyst Major, Defendant Ovelmen added:

Generally speaking, as we indicated, the cost that we're seeing here in 2024, we do expect those to trend into 2025. ***Costs were higher, driven by higher direct costs, primarily.*** If you think about contracted labor, which is 50% of our cost structure, we've seen those increase into the third quarter and through the year. And so we expect that, that's been built in now into our cost estimates as we head into 2025.

152.  Following up, UBS analyst Major asked:

Yes, just again, just thinking about your guidance comments for 2025. You previously looked at in February around 6 million ounces from the core portfolio in terms of gold. You highlight in the comments, 250,000 ounces lower than your previous plans at Lihir and 100 at Brucejack. So is it fair to then assume 350,000 off the 6 million is the new base when we look into 2025?

153.  Defendant Palmer answered UBS analyst Major, stating:

Certainly, the two movers in terms of our managed portfolio, and as I think as Natascha said in her remarks, ***and I followed up with the***

*drivers behind that mine sequence at Lihir and getting in front of understanding the resource definition of Brucejack and the development work and the drilling you need to do for that*. Both of those are progressing well, but it's the ounces for next year reflect that important work. I think the numbers, if you then look at the rest of the portfolio on those trends coming through from '24 flowing into '25 the number is more like 5.6 as you think about this portfolio for 2025, the core portfolio of the 2025. Obviously, we've got some divestments to close out and still got some more work to do on that front. Some of that will flow into 2025, as we complete that divestment work, but that core portfolio, 5.6% is about their gold production number for next year.

154.    Expressing surprise at Defendant's disclosures, RBC Capital Markets analyst Joshua

Mark Wolfson stated and then asked:

> I'm trying to wrap my head around the change -- the significant change in sort of cost expectations and to some degree, production expectations going forward versus what we had been hearing about previously. And I guess, there's sort of two different aspects, at least that I can understand. One is despite the synergy targets being achieved, it sounds like there's some larger integration issues, given the challenges or higher costs mentioned across Brucejack, Lihir and Cadia.
>
> And then on the other hand, we're hearing significant and unexpected inflation expectation changes, which I guess would be a larger industry-related item. I just want to sort of clarify how should we be thinking about these things? And am I sort of assessing this appropriately?

155.    In response to RBC analyst Wolfson, Defendant Palmer stated:

> So maybe pick it up in a few parts. I think the commentary around Lihir, Cadia, Cerro Negro, I think you mentioned, is really the Q3 cost story. So it's around Lihir, we had some costs that we had assumed would be in the fourth quarter for the large autoclave shutdown specialist labor in the remote part of the world moving into Q3. So that's one of the drivers there.
>
> Cadia was power, where a higher power cost coming off our contract for price taker. Cerro Negro, it was more around ramping up following the tragedy earlier this year and making sure we're focused on doing that work safely, some productivity impacts. And then the other factor in the third quarter was we had some concentrate sales at Peñasquito didn't get away at the end of the third quarter due to some weather impacts there that obviously flowed into the fourth quarter.

So that's sort of bit of a ramp up of the third quarter cost story. When I look at '24 flowing into '25, so there's two impacts, the volume impact we just talked about with Dan and the Lihir and Brucejack work next year linked to that. And then the cost impact is sustaining capital and particularly around the work we're putting into the tailings facilities at Cadia. Cadia has got a 30-plus year life, several Panel Caves from come on. And there's work we need to do to ensure that Telfer capacity is matched to the volumes coming out of those Panel Caves. So that story is around volume for those couple of key drivers and then sustaining capital.

156.    Also in response to RBC analyst Wolfson, Defendant Ovelmen stated:

Sure. Just a little more granularity in terms of 2024. So about 1/3 of that is increased due to that lower sales volume, including impacts from Telfer, Lihir and Brucejack. Another 1/3 relates to that higher sustaining capital that we've been talking about largely driven by Nevada. And then the remaining 1/3, half of that is by royalties due to higher gold price and half associated with the G&A. So our run rate synergies are driven by the targeted benefits at Cadia, Red Chris and Lihir. However, we've also had performance challenges within the business, including the Telfer tailings as well as the nonmanagement of underperformed expectations. But -- and I think further to that supply chain, G&A benefits have been impacted by our need to invest in the future of this combined Tier 1 portfolio with a key focus in areas with the integration from Newcrest to new mines as needed. But we're not happy with where we're at, and we're working to reduce these costs.

157.    With respect to Defendants' disclosures about G&A expenses National Bank Financial, Inc. analyst Michael Parkin congratulated Defendants on achieving synergies, but asked "Of the $500 million, how much of that flows through OpEx?" in response, Defendant Palmer stated:

Yes, obviously, the G&A component of that is part of your OpEx. The supply chain is a combination between improving costs and opportunity to get to productivity and volume. A lot of the full potential work is around volume. So you get some more productivity with current gold price, you get that benefit flowing through. So probably of the amount of that delivery, it's probably less than half has come from that an operational exit the soft improvements as opposed to the productivity and volume improvements and the free cash flow that you get coming through. And if I look through that, if I look at where we sit is one of the earlier questions, as we're closing out the integration and the important part of closing out the integration is completing our

divestments and having a clear line of sight to 11 managed operations, 3 projects in execution.

I'm not happy with the G&A that we have that go-forward business. And that's an area that we're going to be focusing on to get that number down to match the go-forward business. And that's a little bit of that higher cost to carry as you work through that transition. But as we get that clarity on the remaining divestments going out the door, we need to ensure that our G&A is matching the size of the go-forward business and expect to see some -- we'll be working hard to get some improvement in that area in the months ahead. (Emphasis added).

158. A number of well-known analysts who had been following Newmont expressed surprise and concern over Defendants' disclosures, and proceeded to slash their price targets in response. CIBC Capital Markets analyst commented on Newmont's increase in costs, in relevant part:

On the operating cost front, we had previously expected costs would decline; however, NEM is now guiding to flat costs YoY. Given the increased uncertainty we believe now exists regarding the company's asset performance over the medium and longer terms, we are lowering our NAV target multiple from 1.4x to 1.3x. We are also reducing our CFPS target multiple from 10.0x to 9.0x.

159. Similarly, Scotiabank released commentary on the Company's disappointing third quarter results, stating, in pertinent part:

Despite the sharp decline in the shares, we believe NEM still faces some headwinds in the short term, given the recent release. This includes 1) uncertainty over cost containment of portfolio with the increase in costs into 2025 (and beyond), 2) uncertainty over the mid-term to LT outlook on the tier 1 portfolio (which now may be very different from February 2024 guidance) and 3) lack on information on several NCM assets acquired with respect to overall progress and outlook.

160. On October 30, 2024, UBS issued a report, downgrading Newmont to Neutral and reducing its price target from $67 to $54, citing a "loss of confidence." According to UBS:

**2025 guidance downgrade and lack of confidence in medium-term**

We downgrade to Neutral and cut our price target to $54/sh (vs $67/sh) as we have limited conviction in NEM's ability to hit guidance and restore market confidence. Factoring in guidance from 3Q results

drives material downgrades to our medium-term production and FCF forecasts, impacting NEM's ability to offer superior/sustainable cash returns vs peers. Offsetting this is the expectation that NEM announce further asset sales that will support near-term cash returns & our positive outlook on gold (LINK). Key drivers in our Buy on NEM were: (1) restoring confidence in operational performance after missing guidance in recent years; (2) divestments accelerating cash returns; (3) modest upside to production/lower costs & limited upside to capex medium-term resulting in superior FCF & sustainable returns vs peers medium-term. NEM 3Q results were a significant negative surprise to us (& the market) with management implying no improvement in core production (-9% vs guide) & costs (+16% vs guide) in 2025 & lack of visibility on medium-term outlook, undermining points 1 & 3 of our Buy thesis.

### Is it all priced in after ~15% decline in NEM shares since 3Q results?

We cut 2025 core gold production to 5.6moz (~600koz/~10%), implying flat production y/y; 2025 cash costs +5% to $1,080/oz (slightly higher y/y); lift sustaining capex from $1.5bn to $1.8bn driving ~15% lift to 2025 all in sustaining costs (AISC) to $1,450/oz. The impact of non-core assets still remaining in our forecasts and limited impact of copper/silver limits 2025 EBITDA/EPS downgrades to 10-17%; but we cut 2025/26 FCF forecasts by ~30%. NEM no longer has the visibility/conviction to reiterate previous 2028 guidance of 6.7moz (8.3moz GEO) at $1,150/oz AISC and referenced long-term run rate of ~6moz (2028 700koz lower vs Feb-24) & 150kt of copper. The definition of this 'long-term run rate' is not clear and we continue to give NEM some benefit of the doubt forecasting 2028 gold production of 6.3moz @ AISC of ~$1,350/oz (real). Based on these assumptions we reduce NPV ~15%; cutting to 6moz @ >$1,400/oz (real) AISC would reduce NPV >20%. With NEM down <15% since results in our view the market has priced in an appropriate response to the cautious medium-term outlook.

### Valuation: Neutral (vs Buy) PT US$54/sh (vs $67/sh)

We base our target price on 12m forward EBITDA at UBS price deck (average $2,825/oz); cut target multiple to 5.5x (vs 6.0) reflecting loss of confidence post guidance downgrades & reduce our target price to $54/sh. At spot (~$2,740/oz) we estimate NEM core assets are trading at 6.7x EV/EBITDA; at 5.5x NEM is discounting ~$2,800/oz. AEM is trading at spot EV/EBITDA premium of ~7.5x but higher FCF yield of ~6% and has superior track record of achieving guidance and delivering value accretive projects/M&A (LINK). We shift preference to AEM within the North American golds.

161.    Lastly, twenty-one days after reporting on Defendant Palmer's and Defendant Ovelmen's meetings with investors either near the very end or after the close of 3Q2024, on October 24, 2024, BNP Paribas issued a report titled "Sin Bin," stating, "Newmont shares have been put in the sin bin, -15% today as the results call highlighted a weaker-than-expected outlook for 2025. Drip feeding bad news doesn't work and the share price reaction today is on track for its worst day since 2008." About Defendants' "sin," BNP Paribas, criticized Defendants belated disclosures, writing:

> Newmont released its 3Q24 results after US close last night. It was weaker-than-expected with elevated costs leading to a miss. 2024 guidance was reiterated though and 4Q24 painted an improved outlook. You can find a more detailed summary of results here.

> What was subsequently disclosed on the results call today was that 2025 was going to be light of expectations. Mgmt noted on the call that Lihir was going to be 250koz less than their prior expectations and Brucejack 100koz less than expected. Managed gold volumes for 2025 of 6.0Moz would thus be 5.6Moz (-7%) and AISC would be flat vs prior guidance and expectations for a cUSD 100/oz decline. Considering this was known at the time of publication of 3Q24 results last night, we firmly believe this should also have been disclosed at the same time.

162.    That these analysts, and others, discussed Newmont's disclosure of then-existing, material, and adverse production and costs circumstances that cause Defendants to modify near and medium term expectations about margins and profitability below-expectations suggests the public placed significant weight on Newmont's statements of prior confidence in goal to deliver higher grades of gold production as well as copper, silver, lead, zinc and molybdenum from a global, diversified Tier 1 portfolio, improve mining operations and cost profile to provide a steady production volume and lower all-in sustaining costs at its Tier 1 operations. The frequent, in-depth discussion of Newmont's guidance confirms that Defendants' Class Period statements were material.

163.    As a direct result of Defendants' disclosures of the truth about production issues at Lihir and Brucejack that impacted Newmont's margins, investors bid down the price of Newmont

from a close of $57.74 per share on October 23, 2024, to a close of $49.25 per share on October 24,

2024, a 14.7% decline on unusually heavy volume of 37.2 million shares traded.

## VII.    INSIDER TRADING

### A.    Defendants Palmer and Toth Institute Stock Trading Plans at Suspicious Times, Enabling Them to Sell Material Amounts of their Own Shares at Artificially Inflated Prices

164.    The trading activities of Defendants Palmer and Toth indicate their respective motives

to achieve personal financial benefits by the sales of stock at artificially inflated prices, while making

false and misleading statements and withholding material adverse facts from the market.

### 1.    Palmer's Stock Sales Before and After He Instituted His 10b5-1 Plan

165.    In its 1Q2024 10-Q, Newmont disclosed that Defendant Palmer had adopted an equity

trading plan pursuant to Exchange Act Rule 10b5-1, stating:

> During the three months ended March 31, 2024, the following directors
> and executive officers adopted or terminated Rule 10b5-1 trading plans
> intended to satisfy the affirmative defense conditions of Rule 10b5-
> 1(c):
>
> On January 29, 2024, Rob Atkinson, Executive Vice President and
> Chief Operating Officer, terminated a trading arrangement previously
> adopted with respect to the sale of securities of the Company's common
> stock (a "Rule 10b5-1 Trading Plan"). Mr. Atkinson's Rule 10b5-1
> Trading Plan was adopted on May 30, 2023, had a term of 14 months,
> and provided for the sale of up to 66,000 shares of common stock
> pursuant to the terms of the plan. As of the date of termination of the
> Rule 10b5-1 Trading Plan, Mr. Atkinson had sold 27,500 shares of
> common stock under its terms. The adoption of such 10b5-1 Trading
> Plan, and its subsequent termination, each occurred during an open
> insider trading window and complied with the Company's standards on
> insider trading.
>
> On March 28, 2024, Tom Palmer, President, Chief Executive Officer
> and Director, adopted a Rule 10b5-1 Trading Plan. Mr. Palmer's Rule
> 10b5-1 Trading Plan has a term of 11 months and provides for the sale
> of up to 104,000 shares of common stock pursuant to the terms of the
> plan. The adoption of such 10b5-1 Trading Plan occurred during an
> open insider trading window and complied with the Company's
> standards on insider trading.

166.    Prior to instituting this Rule 10b5-1 plan on March 28, 2024, Defendant Palmer had previously maintained a Rule 10b5-1 trading plan instituted on March 4, 2022, through which he made sales of Newmont common stock through November 2023.

167.    Rule 10b5-1 requires directors and officers to wait 90 days after the adoption or modification of a Rule 10b5-1 plan for the plan to make its first trade.

168.    Defendant Palmer sold 13,000 shares of Newmont common stock on July 1, 2024 (before the start of the Class Period), at a price of $42.13 per share, pursuant to his Rule 10b5-1 trading plan dated March 28, 2024.

169.    Defendant Palmer sold 20,000 shares of Newmont common stock on August 1, 2024, at a weighted average sales price of $49.5125 per share, pursuant to a Rule 10b5-1 trading plan dated March 28, 2024.

170.    Then, Defendant Palmer sold another 20,000 shares of Newmont common stock on September 3, 2024, at the price of $52.47 per share, again pursuant to his Rule 10b5-1 trading plan dated March 28, 2024.

171.    On October 1, 2024, Defendant Palmer sold another 20,000 shares of Newmont common stock, at the price of $53.81 per share, again pursuant to his Rule 10b5-1 trading plan dated March 28, 2024.

172.    In total, Defendant Palmer sold 60,000 shares of common stock for proceeds of $3,115,850 of Newmont common stock during the Class Period.

173.    After the Class Period, Defendant Palmer made two more regular sales pursuant to his Rule 10b5-1 trading plan dated March 28, 2024, selling 13,000 shares of Newmont common stock on November 1, 2024 at a price of $45.45 per share and 13,000 shares of Newmont common stock on December 2, 2024 at a price of $41.59 per share.

**2.      Toth's Stock Sales Before and After He Instituted His 10b5-1 Plan**

174.      In its 2Q2024 10-Q, Newmont disclosed that Defendant Toth had adopted an equity

trading plan pursuant to Exchange Act Rule 10b5-1, stating:

> Our directors and executive officers may purchase or sell shares of our
> common stock in the market from time to time, including pursuant to
> equity trading plans adopted in accordance with Rule 10b5-1 under the
> Exchange Act and in compliance with guidelines specified by the
> Company's stock trading standard. In accordance with Rule 10b5-1 and
> the Company's insider trading policy, directors, officers and certain
> employees who, at such time, are not in possession of material non-
> public information about the Company are permitted to enter into
> written plans that pre-establish amounts, prices and dates (or formula
> for determining the amounts, prices and dates) of future purchases or
> sales of the Company's stock, including shares acquired pursuant to the
> Company's employee and director equity plans. Under the Company's
> stock trading standard, the first trade made pursuant to a Rule 10b5-1
> trading plan may take place no earlier than 90 days after adoption of
> the trading plan. Under a Rule 10b5-1 trading plan, a broker executes
> trades pursuant to parameters established by the director or executive
> officer when entering into the plan, without further direction from
> them. The use of these trading plans permits asset diversification as
> well as financial and tax planning. Our directors and executive officers
> also may buy or sell additional shares outside of a Rule 10b5-1 plan
> when they are not in possession of material nonpublic information,
> subject to compliance with SEC rules, the terms of our stock trading
> standard and holding requirements. During the three months ended
> June 30, 2024, the following directors and executive
> officers adopted or terminated Rule 10b5-1 trading plans intended to
> satisfy the affirmative defense conditions of Rule 10b5-1(c):
>
> On June 3, 2024, Peter Toth, Executive Vice President and Chief
> Development Officer, adopted a Rule 10b5-1 Trading Plan. Mr.
> Palmer's Rule 10b5-1 Trading Plan has a term of 14 months and
> provides for the sale of up to 36,000 shares of common stock pursuant
> to the terms of the plan. The adoption of such 10b5-1 Trading Plan
> occurred during an open insider trading window and complied with the
> Company's standards on insider trading.

175.      Defendant Toth sold 3,000 shares of Newmont common stock on September 3, 2024,

at the price of $52.47 per share, pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

176.    Also on October 1, 2024, Defendant Toth sold 3,000 shares of Newmont common stock, at the price of $53.81 per share, again pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

177.    In total, Defendant Toth sold 6,000 shares for proceeds of $318,840 of Newmont common stock pursuant his Rule 10b5-1 trading plan during the Class Period.

178.    On November 1, 2024, Defendant Toth sold 3,000 shares of Newmont common stock, at the price of $45.45 per share, again pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

179.    On December 2, 2024, Defendant Toth sold 3,000 shares of Newmont common stock, at the price of $41.59 per share, again pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

180.    On January 10, 2025, Defendant Toth sold 3,000 shares of Newmont common stock, at the price of $40 per share, again pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

181.    On February 3, 2025, Defendant Toth sold 3,000 shares of Newmont common stock, at the price of $42.89 per share, again pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

182.    On March 3, 2025, Defendant Toth sold 3,000 shares of Newmont common stock, at the price of $43.71 per share, again pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

183.    On April 1, 2025, Defendant Toth sold 3,000 shares of Newmont common stock, at the price of $48.46 per share, again pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

184.    On May 1, 2025, Defendant Toth sold 3,000 shares of Newmont common stock, at the price of $51.48 per share, again pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

185.    On June 1, 2025, Defendant Toth sold 3,000 shares of Newmont common stock, at the price of $54.09 per share, again pursuant to his Rule 10b5-1 trading plan dated June 3, 2024.

### 3.    The Insider Sales by Palmer and Toth Demonstrate Scienter

186.    Knowing information adverse to Newmont's guidance concerning material adverse problems at its new mines, Defendants Palmer and Toth failed to disclose that information and instead

instituted Rule 10b5-1 trading plans to capitalize on the Company's inflated share price for as long as possible without suspicion.

187.    Palmer and Toth's stock sales during the Class Period benefited them materially. According to Newmont's Proxy Statement filed with the SEC on March 24, 2025, in 2024, Defendant Palmer was paid a salary of $1,490,192, non-equity incentive plan compensation in the amount of $1,719,848, and stock awards of $9,286,203. Relative to this compensation, and considering that stock awards were not immediately liquid, Palmer's Class Period insider sales proceeds of $3,115,850 were material and establish a strong inference of his scienter. Defendant Toth was paid a salary of $729,742, non-equity incentive plan compensation in the amount of $567,290, and stock awards of $2,003,855. Relative to this compensation, and considering that stock awards were not immediately liquid, Toth's Class Period insider sales of $318,840 were material and establish a strong inference of his scienter.

## VIII.   LOSS CAUSATION AND ECONOMIC LOSS

188.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Newmont's common stock and operated as a fraud or deceit on Class Period purchasers of Newmont's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Newmont's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Newmont's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages under federal securities laws.

189.    In particular, on October 23, 2024, and October 24, 2024, Defendants announced material production and cost issues at two of Newmont's Teir 1 assets, Lihir and Brucejack, that led

the Company to downgrade production estimates and increase cost estimates materially. As a direct and proximate cause of Defendants' disclosures of the truth about Lihir and Brucejack and its impact upon the Company's results, the price of Newmont common stock fell by 14.7%.

190.    These disclosures corrected Defendants' prior misstatements, among others, that Newmont "safely delivered solid production as planned, keeping us firmly on track to meet our full year guidance for both ounces and costs" and Newmont was "now advancing into the delivery stage of the initiatives we have identified at Lihir, Cadia and Red Chris, with the largest value drivers coming from our 2 new Tier 1 assets in Lihir and Cadia."

## IX.    NEITHER THE PSLRA SAFE HARBOR NOR THE BESPEAKS CASUTION DOCTRINE APPLIES

191.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

192.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward- looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

193.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was

authorized and/or approved by an executive officer of Newmont who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## X.    THE FRAUD ON THE MARKET PRESUMPTION

194.    At all relevant times, the market for Newmont's common stock was an efficient market for the following reasons, among others:

a.    Newmont's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

b.    Newmont communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

c.    Newmont was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

d.      Unexpected material news about Newmont was reflected in and incorporated into the Company's stock price during the Class Period.

195.    As a result of the foregoing, the market for Newmont's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Newmont's stock price. Under these circumstances, all purchasers of Newmont's common stock during the Class Period suffered similar injury through their purchase of Newmont's securities at artificially inflated prices, and a presumption of reliance applies.

196.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## XI.    CLASS ALLEGATIONS

197.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Newmont securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

198.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Newmont's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained

only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Newmont or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 23, 2024, there were approximately 1.1 billion shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

199.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

200.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

201.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Newmont;

      c.    whether the Individual Defendants caused Newmont to issue false and misleading financial statements during the Class Period;

74

d.      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.      whether the prices of Newmont's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

202.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    COUNTS

### COUNT I
**For Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**Against Defendants Newmont, Palmer, Viljoen, and Ovelmen**

203.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

204.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

205.    During the Class Period, Defendants Newmont, Palmer, Viljoen, and Ovelmen engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and members of the Class; made various untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the

75

circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Newmont common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Newmont's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

206.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants Newmont, Palmer, Viljoen, and Ovelmen participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Newmont's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

207.    By virtue of their positions at Newmont, Defendants Palmer, Viljoen, and Ovelmen had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and members of the Class, or, in the alternative, Defendants Palmer, Viljoen, and Ovelmen acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions of Defendants Newmont, Palmer, Viljoen, and Ovelmen were committed willfully or with reckless disregard for the truth. In addition, Defendants Palmer, Viljoen, and Ovelmen each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

208.    Information showing that Defendants Newmont, Palmer, Viljoen, and Ovelmen acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, Defendants Palmer, Viljoen, and Ovelmen knew the details of Newmont's internal affairs.

209.    Defendants Palmer, Viljoen, and Ovelmen are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants Palmer, Viljoen, and Ovelmen were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Defendants Palmer, Viljoen, and Ovelmen had a duty to disseminate timely, accurate, and truthful information with respect to Newmont's businesses, operations, future financial condition and future prospects. As a result of their disseminating the aforementioned false and misleading reports, releases and public statements, the market price of Newmont's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company that Defendants Newmont, Palmer, Viljoen, and Ovelmen concealed, Plaintiffs and the members of the Class purchased or otherwise acquired Newmont's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

210.    During the Class Period, Newmont's common stock was traded on an active and efficient market. Plaintiffs and the members of the Class, relying on Newmont's, Palmer's, Viljoen's, and Ovelmen's materially false and misleading statements described herein or relying upon the integrity of the market, purchased or otherwise acquired shares of Newmont's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time

77

Plaintiffs and members of the Class purchases and/or acquired Newmont common stock, the true value of Newmont's common stock was substantially lower than the prices Plaintiffs and members of the Class paid. The market price of Newmont's common stock declined materially and in direct or proximate response to public disclosure of the facts alleged herein, injuring Plaintiffs and members of the Class.

211.    By reason of the conduct alleged herein, Defendants Newmont, Palmer, Viljoen, and Ovelmen knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

212.    As a direct and proximate result of the wrongful conduct of Defendants Newmont, Palmer, Viljoen, and Ovelmen, Plaintiffs and the members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

213.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Newmont's misstatements.

215.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Newmont which had become materially false or misleading.

216.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public statements, and public filings that Newmont disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Newmont to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Newmont's common stock.

217.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Newmont to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

218.    By reason of the above conduct, Newmont is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XIII.  PRAYER FOR RELIEF

219.    WHEREFORE, Plaintiffs demand judgment against defendants as follows:

a.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives and appointing their counsel as lead counsel for the Class;

b.      Requiring Defendants to pay damages sustained by Plaintiffs and the
members of the Class by reason of the acts and transactions alleged herein;

c.      Awarding Plaintiff and the other members of the Class pre-judgment and
post-judgment interest, as well as their reasonable attorneys' fees, expert fees
and other costs; and

d.      Awarding such other and further relief as this Court may deem just and
proper.

## XIV.   JURY DEMAND

220.    Plaintiffs hereby demand a trial by jury.

Dated: July 14, 2025                      Respectfully submitted,

                                          **THE ROSEN LAW FIRM, P.A.**

                                          /s/ *Jacob A. Goldberg*
                                          Jacob A. Goldberg
                                          Leah Heifetz-Li (*pro hac vice* application
                                          forthcoming)
                                          101 Greenwood Avenue
                                          Suite 440
                                          Jenkintown, PA 19046
                                          Tel: (215) 600-2817
                                          Fax: (212) 202-3827
                                          Email:     jgoldberg@rosenlegal.com
                                                     lheifetz@rosenlegal.com

                                          **POMERANTZ LLP**

                                          Jeremy A. Lieberman
                                          Jonathan D. Park (*pro hac vice* application
                                          forthcoming)
                                          600 3rd Avenue
                                          New York, NY 10016
                                          Tel: (212) 661-1100
                                          Fax: (917) 463-1044
                                          Email:     jalieberman@pomlaw.com
                                                     jpark@pomlaw.com

80

**LEVI & KORSINSKY, LLP**

Shannon L. Hopkins (*pro hac vice* application
forthcoming)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
Email:        shopkins@zlk.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*