**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Daniel D. Domenico**

Civil Action No. 1:25-cv-00341-DDD-KAS

JAMES KARAS, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NEWMONT CORPORATION, THOMAS R. PALMER, NATASCHA VILJOEN, and KARYN F. OVELMEN,

Defendants.

---

## ORDER GRANTING MOTION TO DISMISS

---

Plaintiff James Karas alleges that Newmont Corporation and its officers, Thomas Palmer, Natascha Viljoen, and Karyn Ovelmen, made false or misleading statements about Newmont's newly acquired gold mines that artificially inflated its stock price. And when the truth about those mines was revealed, the stock price tumbled, harming shareholders. Plaintiff sued, alleging violations of Sections 10(b) and 20(a) of the Exchange Act.

Defendants moved to dismiss. Doc. 45. For the reasons stated below, the motion to dismiss is granted.

**BACKGROUND**[1]

Newmont Corporation mines gold. In 2024, it operated 17 mines across 13 countries. Doc. 45 at 6. In 2023, Newmont purchased Newcrest, another gold-mining company. In the deal, Newmont acquired two new Tier 1 mines: Lihir in Papua New Guinea and Brucejack in Northwest Canada. A Tier 1 mine is one projected to produce 500,000 ounces of gold each year over at least ten years with relatively lower costs and in a stable country. *See* Doc. 39 ¶ 32. Lihir reported 17.5 million ounces of gold reserves at the time of the acquisition, and Brucejack reported 3.1 million ounces.

But these mines were more trouble than expected. Lihir was described during a 2023 earnings call as a "perennial underperformer" under Newcrest. *Id.* ¶ 47. Even though Newmont expressed confidence that they could turn the asset around, it struggled to do so. The complaint alleges, through the testimony of Former Employee 1, before the acquisitionthe mine suffered from "machinery breakdowns, ocean dumping, and, despite a bunker, the potential for waste to overflow into the pond which fed back into the tanks." *Id.* ¶ 58. Most troublesome were the autoclaves—containers in which ore is exposed to high pressure, high temperatures, and oxygen to aid gold extraction. One of the autoclaves had not been operational for a year before the Newmont purchase. Former Employee 1 alleges that Newmont knew of these and other issues when it established a new reliability plan during the 2024 transition. *Id.* ¶ 63. Former Employee 2 similarly alleges frequent shutdowns due to electrical system failures and other machinery breakdowns.

---

1 Unless otherwise noted, all facts come from Plaintiff's Amended Complaint with the original emphasis. Doc. 39.

Brucejack had its own problems. Former Employee 3 stated that Brucejack was never a Tier 1 mine. *Id.* ¶ 80. The mine had a "nuggety" ore body, meaning the concentration of gold on the site had a high variance. The simple result is that it is very difficult to estimate the amount of gold that will actually be produced. And the complaint alleges that Newmont overestimated production. It further alleges that, even if Newmont did not know about Brucejack's nuggety ore body at the time of the purchase, by July 2024, it should have known due to frequent reconciliation drilling. *Id.* ¶ 90.

On October 23, 2024, Newmont issued a press release announcing disappointing earnings, lower production, and increased cost. Ms. Viljoen said of Lihir

> [O]ur operational focus at Lihir will remain on reducing complexity to deliver more sustainable and predictable results at this Tier 1 operation. ***In the short term, these efforts will result in lower than initially anticipated production next year due to lower throughput to allow for asset reliability improvement work and changes to the mine sequencing, including the establishment of wider ramps to manage surface water and repositioning all roads to be more effective and efficient.***

*Id.* ¶ 146. Similarly, about Brucejack she said

> ***[W]e have taken a step back this year to do the development and drilling work to ensure that we improve our knowledge of this nuggety ore body.*** We continue to experience periods of exceptional high grades, including a 1-day average of 52 grams per ton last month and an average of over 20 grams per ton in the same week. ***As a result of the work we are doing, we anticipate that the gold production next year from Brucejack will also be largely consistent with this year, all around 100,000 ounces lower than our initial guidance for 2025 that we provided back in February.***

*Id.* Mr. Palmer confirmed that reduced production and increase costs would continue into 2025 "driven by the ***lower than previously expected production from two of our new operations in Lihir and Brucejack.***" *Id.* ¶ 148.

Once investors learned that these literal gold mines were not figurative gold mines, Newmont's stock price dropped 14.7% from $57.74 to $49.25 per share.

## APPLICABLE LAW

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), "prohibit[s] making any material misstatement or omission in connection with the purchase or sale of any security." *Smallen v. W. Union Co.*, 950 F.3d 1297, 1304 (10th Cir. 2020) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)). To recover damages for a violation of Section 10(b), Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton*, 573 U.S. at 267.

Defendants move to dismiss, arguing that Plaintiff has not properly alleged an actionable misstatement or scienter. Under Federal Rule of Civil Procedure 12(b)(6), a court's role is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

The Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737, applies a heightened pleading standard to both the material misrepresentation and scienter elements. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). "In

order to overcome a motion to dismiss, a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)). And "it is not enough for a plaintiff to allege generally that the defendant acted with scienter. . . a plaintiff must, 'with respect to each act or omission alleged . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)). But as with any other motion to dismiss, the court takes all well pled factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## DISCUSSION

### I. Motion to Strike

As a threshold matter, Plaintiff moved to strike Defendants' motion to dismiss on the grounds that the motion's appendices either wrongfully exceed the Court's word limits or are improper for consideration at the motion to dismiss stage.

Plaintiff is correct that "[g]enerally, we only consider facts alleged in the complaint itself in evaluating the sufficiency of the complaint." *Smallen*, 950 F.3d at 1305. But a court can also "consider documents the complaint incorporates by reference, documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity, and matters of which a court may take judicial notice." *Id.* (internal quotations omitted).

I agree with the Defendants that the exhibits fit into those permissible categories. Plaintiff does not dispute their authenticity or centrality.

The Tenth Circuit recognizes that "[i]n securities cases it is not unusual to consider documents incorporated by reference into the complaint, public documents filed with the [Securities and Exchange Commission], and documents the plaintiffs relied upon in bringing suit." *Employees' Ret. Sys. of Rhode Island v. Williams Companies, Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018) (internal quotations omitted). This practice can be abused to dispute facts found in the complaint. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). So I am mindful that "such documents may properly be considered only for what they contain, not to prove the truth of their contents." *Employees' Ret. Sys. of Rhode Island*, 889 F.3d at 1158 (quoting *Roth v. Jennings*, 489 F.3d 499, 511 (2d Cir. 2007)).

I also see no issue with Defendants' chart of the alleged misstatements. The chart merely reproduces and numbers the allegedly false misleading statements. This chart contains no argument and so does not flout the Court's word limits. Like the district court and Tenth Circuit in *Pluralsight*, I adopt the Defendants' numbering, which I find helpful and convenient, but should the chart and complaint differ, I rely "solely on the statements as alleged in the complaint." *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1249 n.2 (10th Cir. 2022).

The motion to strike is denied.

## II. Motion to Dismiss

### A. Actionable Misstatements

Plaintiff alleges that between July and October 2024, Defendants made several materially false statements about the financial prospects of the company. I begin by reproducing the statements and Plaintiff's allegations about their falsity from the complaint. The statements come from the Amended Complaint, and include the emphasis from that

filing, *see* Doc. 39 ¶¶ 110–44, but for clarity and consistency, I adopt the Defendants' numbering, *see* Doc. 45-1.

*Statement 1*

The first allegedly actionable statement was made in Newmont's second quarter 2024 press release, issued and filed with the SEC on July 24, 2024. It read:

> Attributable gold production1 decreased 4 percent to 1,607 thousand ounces from the prior quarter primarily due to lower production at Cerro Negro as a result of the suspension of operations during the quarter following the tragic fatalities of two members of the Newmont workforce on April 9, 2024. Operations at Cerro Negro safely resumed on May 24, 2024. In addition, operations were suspended as of April 14, 2024 at Telfer, one of Newmont's non-core assets, as further work is completed to remediate the safe operation of the tailings storage facility. ***Second quarter production was also impacted by lower production at Lihir due to heavy rainfall impacting mine sequencing***, as well as lower production at Akyem due to lower grades as a result of the ongoing stripping campaign. These impacts were partially offset by higher production at Porcupine, Brucejack and Peñasquito.
>
> ***Full year production for 2024 is expected to be second-half weighted as previously indicated, with a sequential increase weighted towards the fourth quarter. The second-half weighting is expected to be driven primarily by*** improved grades at Peñasquito, Ahafo and Tanami, ***improved throughput from Lihir*** and Boddington and sequential improvements delivered from our non-managed joint venture operations.

Doc. 39 ¶ 110. Plaintiff alleges this statement was false and misleading because "production problems such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow had already materially impacted Lihir's performance as to both reliability and safety." *Id.* ¶ 111.

*Statement 2*

The same press release also stated "Gold AISC[2] per ounce increased 9 percent to $1,562 per ounce compared to the prior quarter ***primarily due to higher CAS[3] and higher sustaining capital spend.***" *Id.* ¶ 112. Plaintiff alleges this statement was misleading because "material problems at Lihir and Brucejack relating to both production and costs had caused and would continue to cause Newmont to expend more to produce each ounce of gold . . .." *Id.* ¶ 113. He adds that "[b]y choosing to discuss AISC, Defendants had a duty to disclose these facts." *Id.*

*Statement 3*

The next day, July 25, 2024, during Newmont's second quarter 2024 earnings call, Defendants made seven additional statements that Plaintiff alleges were false or misleading. First, Mr. Palmer stated

> We delivered solid operational performance as planned, ***keeping us firmly on track to achieve our 2024 guidance and positioning us to deliver improving financial results.*** These solid results have also enabled us to progress our capital allocation priorities, which I'll touch on in a moment. With a continued focus on safely delivering, we've also made meaningful progress on the 4 key commitments we made to our shareholders at the start of the year.

*Id.* ¶ 114. Plaintiff alleges that "Defendants failed to disclose they knew or recklessly disregarded that material adverse circumstances at Lihir and Brucejack would materially, adversely impact Newmont's production and increase its AISC, contracting margins materially." *Id.* ¶ 115.

*Statement 4*

Mr. Palmer continued:

> Looking at the 3 components of our synergy delivery, and starting with full potential. We are now ***advancing into***

[2] Lingo for "all-in sustaining costs."

[3] Lingo for "cost applicable to sales."

> ***the delivery stage of the initiatives we have identified at Lihir, Cadia*** and Red Chris, with the ***largest value drivers coming from our 2 new Tier 1 assets in Lihir and Cadia.*** On our call last quarter, we provided an update on the opportunities we have identified at Lihir. In this quarter, I'll briefly describe some of the opportunities we see in front of us at Cadia. ***We recently completed our full potential diagnosis phase at Cadia, from which we have identified a series of initiatives that are expected to deliver more than $100 million of value by the end of next year.***

*Id.* ¶ 116. Plaintiff challenges this statement because of "production problems and rising AISC at Lihir that had already reduced Newmont's production and decreased its operating margins, materially adversely impacting Newmont's performance for both 3Q2024 and Newmont's near and medium-term financial results." *Id.* ¶ 117.

*Statement 5*

On the same call, Ms. Viljoen delivered prepared remarks that claimed:

> Our managed operations delivered solid second quarter results in line with our expectations and outlook for the year. ***With a focus on size and efficient production at each of our managed operations, we are heading into the second half of the year with confidence in our ability to deliver on our business plan and the commitments Tom reiterated earlier.*** And similar to the first half of the year, our operational results in the third and fourth quarters will be largely driven by reduction from our 6 managed Tier 1 operations.

*Id.* ¶ 118. Plaintiff again states that it is false or misleading to forecast efficient production and ability to deliver because of "material production issues plagued at least Newmont's Lihir and Brucejack" and those factual conditions "undermined the basis of Defendants' statement." *Id.* at ¶ 119.

*Statement 6*

Ms. Viljoen continued:

> And finally, ***at Lihir, second quarter production decreased from the first quarter primarily due to heavy rainfall, which contributed to soft ground conditions that in turn impacted mine sequencing.*** Production levels are expected to remain consistent in the third quarter as the site commences a planned 120-day shutdown of the primary autoclave. And just to bring the autoclave shutdown into perspective, the process includes not only shutting down the autoclave itself, but also removing the brick layer at [indiscernible] membrane, inspecting the 5.5-meter diameter steel shell, applying a high-temperature tolerant membrane and rebricking the 48-meter long structure, which is nearly the length of a new Olympic swimming pool. Once complete, we anticipate gold production will return to normal levels in the fourth quarter, positioning Lihir for a strong finish to the year. Taking everything into account, we anticipate an increase in gold production mix quarter, setting us up to deliver Lihir's higher production in the fourth quarter.

*Id.* ¶ 120. Plaintiff alleges that this statement is misleading because it was not just rain that decreased production at Lihir, but "material, adverse production issues with both reliability and safety such as outdated and unreliable machinery, ocean dumping, and potential for waste overflow . . .." *Id.* ¶ 121.

*Statement 7*

Ms. Ovelmen also delivered prepared remarks during the call. He told investors

> And whilst we are pleased with the improvement in free cash flow, we are still not satisfied and are working to further improve margins. Looking ahead, we ***anticipate higher free cash flows in the second half of the year driven by increased production values and lower unit costs***, as Tom and Natascha just mentioned. Heading into the second half of the year, we remain firmly on track to achieve our full year guidance of reduction, cost and capital spend. And as Natascha mentioned, production is expected

> to increase in the third quarter with the year's strongest performance anticipated in the fourth quarter.

*Id.* ¶ 122. Plaintiff alleges it is false or misleading to tout higher cash flows and lower production costs without disclosing the production and cost issues at Lihir and Brucejack. *Id.* ¶ 123.

*Statement 8*

At the end prepared remarks, Mr. Palmer reiterated that "***[w]e safely delivered solid production as planned, keeping us firmly on track to meet our full year guidance for both ounces and costs.***" *Id.* ¶ 124. Plaintiff again alleges that this statement is actionable because Mr. Palmer failed to disclose that he knew of material issues at Lihir and Brucejack. *Id.* ¶ 125.

*Statement 9*

The Defendants took questions from analysists on the earnings call. In response to a question from a Scotiabank analyst, Mr. Palmer stated:

> Think about -- I made the picture this way, and I think you're not too far off the mark. You certainly got to see the synergies getting through -- particularly those coming from full potential in the fourth quarter as those programs get their momentum up. You're certainly going to see the highest quarter 4 gold ounces in the fourth quarter. That's from some of our key assets that Natascha covered in her comments. The 2 non-managed joint ventures, so NGM need to deliver on their commitments and they've got that strong fourth quarter. ***Our direct costs are pretty stable across the year.*** And certainly ***what we're seeing in the first half flowing through the second half, pretty stable.*** So I think the picture you're painting in terms of that third quarter weighting to the fourth quarter weighting is a reasonable position to be thinking about in terms of that weight between the third and the fourth quarter. You will see a step up in the third and then a step up into the fourth to get to our numbers.

*Id.* ¶ 127. Plaintiff alleges that this answer was false or misleading because Mr. Palmer knew that production and cost issues at Lihir and

Brucejack had already and would continue to impact Newmont's margins. *Id.* ¶ 128.

<u>*Statement 10*</u>

On July 25, 2024, Newmont filed its quarterly 10-Q report with the SEC. That report stated that "[t]here were no material changes from the risk factors set forth under Part I, Business; Item 1A, Risk Factors in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, as filed with the SEC on February 29, 2024." *Id.* ¶ 129. Plaintiff alleges that statements from that section of the 2023 10-K that Newmont readopted were false or misleading. The complaint identifies the following section:

> ***Increased operating and capital costs could affect our profitability.***
>
> Costs at any particular mining location are subject to variation due to a number of factors, such as variable ore grade, changing metallurgy and revisions to mine plans in response to the physical shape and location of the ore body, as well as the age and utilization rates for the mining and processing related facilities and equipment. In addition, costs are affected by the price and availability of input commodities, such as fuel, electricity, labor, chemical reagents, explosives, steel, concrete and mining and processing related equipment and facilities. Commodity costs are, at times, subject to volatile price movements, including increases that could make production at certain operations less profitable. Further, changes in laws and regulations can affect commodity prices, uses, and transport. Reported costs may also be affected by changes in accounting standards. ***A material increase in costs at any significant location could have a significant effect on our profitability and operating cash flow.***
>
> ***Our operational costs, including, without limitation, labor costs, can be impacted by inflation.*** Certain of our operations are located in countries that have in the past experienced high rates of inflation, such as in Argentina, Suriname, and Ghana. It is possible that in the future, high inflation in the countries in which we operate may

> result in an increase in operational costs in local currencies (without a concurrent devaluation of the local currency of operations against the dollar or an increase in the dollar price of gold, copper, silver, lead or zinc). ***A material increase in costs at any significant location could have a significant effect on our profitability and operating cash flow.***
>
> ***We could have significant increases in capital and operating costs over the next several years in connection with*** new projects, costs related to closure reclamation activities, ***and in the sustaining and/or expansion of existing mining and processing operations.*** Costs associated with capital expenditures may increase in the future as a result of factors beyond our control. ***Increased capital expenditures may have an adverse effect on the profitability of and cash flow generated from existing operations,*** as well as the economic returns anticipated from new projects. Significantly higher and sustained increases in operational costs or capital expenditures could result in the deferral or closure of projects and mines in the event that costs become prohibitive.

*Id.* Plaintiff challenges these risk disclosures, arguing that when they were readopted in the 10-Q, defendants already knew about or recklessly disregarded production and cost issues at the new mine. *Id.* ¶ 130.

*Statement 11*

Nearly two months later, on September 17, 2024, Ms. Viljoen and Ms. Ovelmen spoke at the Denver Gold Forum (held in Colorado Springs, oddly enough). When asked about Newmont's new assets, Ms. Viljoen answered:

> So firstly, when I think about our new assets, ***I can't think about it without stepping back and looking at the full portfolio of assets because what it enabled for us is to really step back and turn these inside -- these assets inside out in a way that we haven't done before***, because we have the opportunity now to look at this entire portfolio of assets.
>
> The flexibility that we can build in our operational performance and how we think about our sustaining capital

> profile and staging that to ensure that we have a stable ounce profile and a sustainable -- sustainable capital profile.
>
> When we consider the full potential program on the new assets, particularly, we've run all 4 assets that will remain in the portfolio now through our full potential program. And that is -- all of those are in execution at the moment. We have committed $200 million are as part of the synergies that will come from that process, and we're well on track.
>
> But I do want to emphasize that not only through the full potential program, but in stepping back and changing the constraints that we've put on our operations, the constraints that we've put on how we look at our portfolio of assets and how that enterprise have interdependency, ***it is an opportunity for us to make a real step change in productivity, bringing costs down to sustainable low cost base and working towards that economic margin expansion*** that Karyn has been talking about.

*Id.* ¶ 131. Plaintiff points out that these statements claim that the company had thoroughly reviewed the new mines—"turned these assets inside out"—but still did not disclose cost and production issues. *Id.* ¶ 132.

<u>*Statement 12*</u>

Plaintiffs next challenge a chart distributed to BNP Paribas and investors in London and Paris near or after the close of Q3 2024.

**Figure 2: Management is focused on delivering full potential from existing Tier 1 portfolio with no expectations for additional M&A**

Attributable gold equivalent production




*Id.* ¶ 136. Plaintiffs assert that this October 2024 chart shows the same projections that the Defendants presented in February 2024 despite Defendants' knowledge of production and cost uses that were flattening gold production relative to the February forecast. *Id.* ¶ 137.

*Statement 13*

Similarly, in October 2024, Defendants distributed the following costs chart to investors:

**Figure 3: Declining AISC and flat development capex to help lift FCF generation**



*Id.* ¶ 139. Again Plaintiff alleges that this chart is false because it is substantially the same as a chart distributed in February 2024, but Defendants failed to adjust for the cost issues at the new mines. *Id.* ¶ 140.

### 1. Safe Harbour

Defendants first argue that most of the statements fall under the PSLRA's safe harbor for forward-looking statements. The statute exempts some such statements from liability so long as:

> (A) the forward-looking statement is--
>
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>
> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement--
>
> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
>
> (ii) if made by a business entity; was--
>
> (I) made by or with the approval of an executive officer of that entity; and
>
> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1)(A)–(B). The statement is protected (1) if the statement is forward-looking and accompanied by meaningful cautionary statements; (2) if the statement is immaterial; or (3) if Plaintiff fails to show the statement was made or approved by an executive with actual knowledge of falsity. *See In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1293 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015).

Newmont argues that statements 1(b), 3, 4, 5, 7, 9, 10, 11, 12, and 13 fall under this safe harbor.

*Statement 1(b)*

In relevant part, statement 1(b) states, "[f]ull year production for 2024 is expected to be second-half weighted as previously indicated, with a sequential increase weighted towards the fourth quarter. The second-half weighting is expected to be driven primarily by . . . improved throughput from Lihir." Doc. 39 ¶ 110 (emphasis omitted). This is a "classic growth and revenue projection[], which [is] forward-looking on [its] face." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014). The press release from which that statement was taken, Doc. 45-10 at 6, concludes with a disclaimer on forward-looking statements. It warns that the press release contains forward looking statements that "impl[y] an expectation or belief as to future events or results," that such expectations are "expressed in good faith and believed to have a reasonable basis," and that "such statements are subject to risks, uncertainties and other factors, which could cause actual results to differ materially." *Id.* at 33.

Plaintiff does not argue that this statement is not forward-looking or that it lacks cautionary statements. He broadly argues that cautionary statements are inadequate if the identified risk has already occurred, but he does not explain what has already occurred that would make these projections already false. Statement 1(b) is protected by the safe harbor.

Statements 3–5 and 7–9 all come from Newmont's Second-Quarter earnings call. Doc. 45-9. And they all rely on the same cautionary statements. To analyze these statements, I begin by determining whether each statement is forward-looking. Then I will determine whether the cautionary statements were adequate.

<u>*Statement 3*</u>

Statement 3 reads "We delivered solid operational performance as planned, ***keeping us firmly on track to achieve our 2024 guidance and positioning us to deliver improving financial results.***" Doc. 39 ¶ 114 (emphasis in original). Plaintiff argues that this is not a forward-looking statement because it describes the present state of the company. While the first part of the statement may describe current financial conditions, that statement is not challenged. When this statement was made, Newmont had just released its second-quarter earnings, and Plaintiff makes no reference to those earnings and does not argue they are not "solid." He challenges only the forward-looking application of the information. The complaint alleges that Defendants knew adverse circumstances "*would* materially, adversely impact Newmont's production and increase its [costs]." *Id.* (emphasis added). The complaint takes issue with the predicted future performance, not the current results.

Courts have split on the issue, but I agree with the circuits who have held that "an unadorned statement that a company is 'on track' to achieve an announced objective, or a simple statement that a company knows of no issues that would make a goal impossible to achieve, are merely alternative ways of declaring or reaffirming the objective itself." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021); *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) ("The 'on track' and 'position us' language here, however, does not advert to a particular current fact such as cash on hand, but expresses only defendants' continuing comfort with the earlier, October annual projection, which they were then reiterating; that is, it amounts in essence to a reaffirmation of that projection."). Like those statements, the "on track"

claim here merely reiterates a previous projection and is forward-looking.

*Statement 4*

Statement 4 touts that the company was "now advancing into the delivery stage of the initiatives we have identified at Lihir, Cadia and Red Chris, with the largest value drivers coming from our 2 new Tier 1 assets in Lihir and Cadia." Doc. 39 ¶ 116 (emphasis omitted).[4] This statement describes what the company is "now" doing, and so is a verifiable, present fact not subject to the statutory safe harbor.

*Statement 5*

The complaint emphasizes the following part of Statement 5: "With a focus on size and efficient production at each of our managed operations, we are heading into the second half of the year with confidence in our ability to deliver on our business plan and the commitments Tom reiterated earlier." *Id.* ¶ 118 (emphasis omitted). Like the "on track" claims, this statement merely reinforces previous projections and so is forward-looking.[5]

[4] The Complaint also emphasizes a second sentence: "[w]e recently completed our full potential diagnosis phase at Cadia, from which we have identified a series of initiatives that are expected to deliver more than $100 million of value by the end of next year." Doc. 39 ¶ 116 (emphasis omitted). But it does not allege why this sentence is false and alleges no facts about the Cadia mine. And, in any event, its $100 million dollar projection is forward-looking.

[5] Even if the statement describes the present thinking of management, it is not actionable because it is immaterial. It is "vague (if not meaningless) management-speak upon which no reasonable investor would base a trading decision." *In re Level 3*, 667 F.3d at 1340.

*Statement 7*

"[W]e anticipate higher free cash flows in the second half of the year driven by increased production values and lower unit costs," *Id.* ¶ 122, is cash flow projection and plainly forward-looking, *see Intuitive Surgical*, 759 F.3d at 1058.

*Statement 8*

Statement 8 claims "[w]e safely delivered solid production as planned, keeping us firmly on track to meet our full year guidance for both ounces and costs." Doc. 39 ¶ 124 (emphasis omitted). The complaint does not allege that the then-present statement that the company delivered solid production is false, and, like Statement 3, the claim that the company remained "on track" merely reaffirms a previous projection.

*Statement 9*

In the last alleged misstatement from the earnings call, Statement 9, Mr. Plamer stated "[o]ur direct costs are pretty stable across the year. And certainly what we're seeing in the first half flowing through the second half, pretty stable." *Id.* ¶ 127. He made this statement in the context of projecting increased revenues in the second-half of the year, so Defendants argue that the statement is forward-looking because it projects stable costs to continue. But this statement is different from the "on track" claims. Here, Mr. Palmer's claim is of a current state, "direct costs are pretty sable," that he expects to continue. *Id.* The Seventh Circuit found a similar statement fell outside the safe harbor; a claim that "sales are 'still going strong' does not entitle [Defendant] to a safe harbor with regard to the statement's representation concerning current sales." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008). So too here, the safe harbor does not apply to the statement that direct costs were stable over the first half of the year.

*Statements 3, 5, 7, and 8—Cautionary Statements*

Having concluded that Statements 3, 5, 7 and 8 are forward-looking. The question is whether they were accompanied by cautionary statements. The second quarter earnings call begins with Mr. Palmer directing listeners to "note our cautionary statement and refer to our SEC filings." Doc. 45-9 at 5. This directs listeners to the 10-Q filed the day before, and the written cautionary statements therein. Doc. 45-11 at 78. The second quarter 10-Q also incorporates by reference the risk factors from the company's annual 10-K statement. *Id.* at 79.

Plaintiff argues that these cautionary statements are inadequate only because he alleges that the risks had already occurred. He in fact alleges that, by adopting the 10-K statements without change, the cautionary statements in the 10-Q were materially misleading. The 10-K included several warnings: "[i]ncreased operating and capital costs could affect our profitability;" "[a] material increase in costs at any significant location could have a significant effect on our profitability and operating cash flow;" "[o]ur operational costs, including, without limitation, labor costs, can be impacted by inflation;" "[a] material increase in costs at any significant location could have a significant effect on our profitability and operating cash flow;" "[w]e could have significant increases in capital and operating costs over the next several years in connection with new projects, costs related to closure reclamation activities, and in the sustaining and/or expansion of existing mining and processing operations;" and "[i]ncreased capital expenditures may have an adverse effect on the profitability of and cash flow generated from existing operations." Doc. 39 at ¶ 129. If these risks had already materialized and they were false when made, then Plaintiff is correct that they are inadequate cautionary statements.

But Plaintiff alleges that these statements were misleading only because vague "production and cost issues" had already "impacted Newmont's margins" and would continue to do so. But the complaint does not allege with any specificity what changed between February and July. True, the complaint contains general allegations that Lihir and Brucejack were not as profitable as the company had hoped. But Plaintiff alleges only in conclusory fashion that Defendants knew of these problems "no later than late July 2024." *Id.* ¶ 4. The Tenth Circuit has rejected that type of claim: "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (discussing scienter).

And Plaintiff gives us no specific failures that occurred before the July statement. Despite claiming the production and cost issues "had materially, adversely impacted" margins, *id.* ¶ 130, Plaintiff does not point to any second-quarter financial results. And despite stating that the issues "would continue impacting for the near-term and medium term," *id.*, the complaint contains no specific facts that allege any problems in the past were certain to continue in the future, or that the company knew that was the case. In short, the complaint leaves the Court to guess what specifically changed between February and July.[6]

[6] Courts have remarked that "[w]hat makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false." *Philadelphia*, 264 F.3d at 1260; *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548–49 (9th Cir.1994) (en banc) (stating the same).

Because the complaint does not properly allege Statement 10, the cautionary statements, were false, Statement 10 is not actionable and Statements 3, 5, 7 and 8 are protected by the statutory safe harbor.

The remaining three statements were made separately from the second-quarter earnings release, but Defendants argue that they too are properly forward-looking. Even if they are forward looking, it is not clear that they were accompanied by effective cautionary statements. *See* Doc. 45 at 13 (identifying only a generic disclaimer from the Denver Gold Group and the company's general practice for "presentations like these."). I need not decide those questions, however, because Plaintiff fails to allege falsity.

### 2. Falsity

For the remaining statements (1(a), 2, 4, 6, 9, 10, 11, 12, and 13), Plaintiff must plausibly allege falsity, materiality, and scienter. But Plaintiffs claims meet a common end: under the heightened pleading standard, he has failed to plausibly allege falsity.

The Court evaluates the facts alleged in the complaint to determine "whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir.

---

This is particularly true in mining, a famously unpredictable business. For example, Newmont's stock fell from $57.74 to $49.25 on October 24, 2024. Doc. 39 at ¶ 6. But as of this writing, the price is $118. *Stock Information*, Newmont Corp. (last visited Aug. 14, 2026, at 1:01 MT), https://www.newmont.com/investors/stock-information/default.aspx. This growth is at least in part because of Lihir. *See* Cecilia Jamasmie, *Newmont eyes 5M-ounce boost from Lihir gold mine*, (July 24, 2026), https://www.mining.com/newmont-eyes-5m-ounce-boost-from-lihir-gold-mine/. The PLSRA is not in place to punish statements that turn out to be wrong, just those that are fraudulent when made.

2018). The Tenth Circuit has identified six factors to consider when evaluating falsity:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Id.* at 1298–99. And, under the PLSRA's heightened pleading standard "the facts alleged in an information and belief complaint will usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1103 (10th Cir. 2003).

In Plaintiff's telling, Defendants purchased these new mines and, in February 2024, made optimistic financial projections based off their new assets. By October 2024, Defendants realized the mines had significant problems and this resulted in lower production and higher costs than expected. *See* Doc. 39 ¶¶ 145–46. But Plaintiff alleges that Defendants knew, or at least should have known, this truth earlier and should have disclosed it. *See id.* at ¶ 121 ("no later than July 2024, Lihir had already begun experiencing material, adverse production issues"); ¶ 147 ("It is clear, however, that no later than July 24, 2024, Defendants had either gained sufficient understanding of Newmont's Brucejack investment or were severely reckless in failing to understand that Brucejack was nuggety.").

The complaint describes, citing anonymous former employees, the general state of both Lihir and Brucejack. Former employees 1 and 2 explain that Lehir was not profitable, had high operational costs, and

had frequently unreliable equipment. Similarly, former employee 3 asserts that Brucejack did not qualify as a Tier 1 mine and had other costly infrastructural issues.

But these allegations describe only the general state of the mines. The complaint does not allege any specific facts that allow the Court to conclude that the statements were false in July as opposed to October. The closest the complaint comes to a specific fact about Lihir is the allegation that the largest autoclave "had been out of operation for 2 or 3 years and was considered a disaster." Doc. 29 at ¶ 59. But Mr. Palmer disclosed that Autoclave 4 would be shut down for 120 days. *Id.* ¶ 54 ("the guidance for Lihir for the year respected that the largest of the autoclaves being down from 120 days."). If Newmont knew about but failed to disclose the autoclave shutdown, that kind of fact may suggest falsity. But because Mr. Palmer disclosed the shutdown as early as February, *see* Doc. 39 ¶ 50, so it is unclear how investors were misled.

Brucejack's biggest problem was its inconsistent, "nuggety" ore body, and the complaint only states in conclusory fashion that "reconciliation drilling during 2024 necessarily alerted Defendants to issues with respect to production at Brucejack no later than July 24, 2024." *Id.* ¶ 90. The complaint contains no specific facts about what the reconciliation drilling revealed, and when.

The October revelations confirm that Lihir and Brucejack were not as profitable as Newmont hoped. But taking that October fact and assuming Newmont knew it was also the case in July is impermissible "fraud by hindsight." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997). The October revelations occurred because Newmont attained and reported disappointing earnings. Doc. 39 ¶ 145. Plaintiff does not point to any concerning financials in July, the date of the alleged fraud, nor does he point to specific production issues that occurred before

July and were expected to recur. In fact, some of the allegations are not just conclusory, they are circular. *See id.* ¶ 115. ("Defendants failed to disclose they knew or recklessly disregarded that *material adverse circumstances* at Lihir and Brucejack *would materially, adversely impact Newmont's production* and increase its AISC, contracting margins materially." (emphasis added)).

Plaintiff must do more than simply allege the generally disappointing nature of Lihir and Brucejack. Instead, he "must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made." *Grossman*, 120 F.3d at 1124 (internal quotation omitted). And because Statements 10, 12, and 13 are readoptions of statements made in February, Plaintiff must specifically allege what changed and when and what defendants knew and when. He must do so with precise facts. Under this heightened standard, the allegations in the complaint are too general to conclude that these statements were false when made.[7]

**CONCLUSION**

It is ORDERED that:

Plaintiff's MOTION TO STRIKE, Doc. 47, is DENIED;

Defendants' MOTION TO DISMISS, Doc. 45, is GRANTED;

---

[7] Though the Court need not reach this point, the failure to plead that the statements were known to be false when made is also dispositive as to the scienter element. *See Philadelphia,* 264 F.3d at 1260 ("[B]ecause corporate officials should be liable for failing to reveal only those material facts reasonably available to them . . . allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." (analyzing scienter) (quotations omitted)).

Plaintiffs' request for leave to amend complaint is GRANTED. Plaintiff may file an amended complaint no later than 9/11/2026. Failure to do so will result in the Court closing the case.

DATED: August 14, 2026

BY THE COURT:

______________________________
Daniel D. Domenico
Chief United States District Judge